JOHN REAL, Plaintiff in Error, *v.* THE PEOPLE OF THE STATE OF NEW YORK, Defendants in Error.

The amended judiciary article (article six of the Constitution of the State of New York), took effect January 1st, 1870. Previous to that time, justices of the Supreme Court were not disqualified, by the provisions of section 8 of that article, from sitting at General Term in review of their own decisions, although such General Term was held after the board of State canvassers had announced the result of the canvass, showing the adoption of that amendment.

An indictment, which is sent to the Court of Oyer and Terminer by a court of General Sessions, may properly be tried at any term thereafter, although the order of the sessions is that it be sent to the *next* Court of Oyer and Terminer.

On the trial of an indictment for murder, charging the killing to have been effected by shooting the deceased in the head, it being proved that there were two bullet wounds, one in the head and the other in the body, either of which would produce death, the refusal of the court to charge that, "If the proof fails to show which wound it was that actually killed, the case is not made out according to the indictment," is not error.

Evidence that the defendant, in an indictment for murder, was in the habit at times of drinking to excess, and of the effect of this habit upon his mind, is incompetent, unless confined to a period within a few days of the homicide.

It is competent to ask a witness on cross-examination, whether he has been in jail or State prison, and how much of his life he has passed in such places, with a view to impair his credibility. The extent of such cross-examination rests somewhat in the discretion of the court, but the discretion should be liberally exercised.

The opinions of witnesses who are not experts, on the general question of the state of the prisoner's mind and his mental condition, are inadmissible. Accordingly, when non-professional witnesses were asked, "From what you saw of him that night, what impression did his words and acts make upon your mind? What impression as to his condition of mind did his conduct and acts and words make upon you at the time? In what state of mind did you believe him to be by reason of what he did and said upon that occasion?" and other like questions.—*Held*, that they were properly excluded.

*Newcomb* v. *Griswold*, 24 N. Y., 298; *Clapp* v. *Fullerton*, 34 N. Y., 190, and *The People* v. *O'Brien*, 36 id., 276, distinguished.

(Argued March 22d, 1870; decided June 21st, 1870.)

ERROR to the General Term of the Supreme Court, in the first judicial district, to review the judgment of that court

affirming the conviction of the plaintiff in error, in the court of Oyer and Terminer, in the city and county of New York, for the murder of John Smedick.

John Real, the plaintiff in error, was indicted at the New York Sessions, August, 1868, for the murder of John Smedick, by shooting him in the head with a pistol. The indictment was sent to the Oyer and Terminer, by order dated August sixth, and was tried in the latter court in February, 1869, Justice GEORGE G. BARNARD presiding, resulting in a verdict of guilty of murder in the first degree; and the prisoner was sentenced to be hanged.

Execution was stayed by writ of error to the General Term, where the judgment of conviction was affirmed, two justices voting for affirmance, one of whom was Justice BARNARD, and one for reversal. The case was heard at the General Term, before the election of 1869, but was not decided until after the result of that election was officially declared.

Writ of error was taken therefrom to this court, January 4th, 1870.

Upon the trial of the indictment, the plaintiff in error objected to the jurisdiction of the court, on the ground that the term at which the case was brought on, was not the *next* Court of Oyer and Terminer after the order of the Court of General Session transferring the indictment. The objection was overruled, and the plaintiff in error excepted.

Evidence was given on the part of the people, to show that the plaintiff in error, on the night of July 23d, 1868, at about half-past ten, was standing behind a coal box, at the corner of Thirty-second street and First avenue, in the city of New York; that John Smedick, the deceased, who was a policeman, came down the avenue, in walking his round as an officer, as far as the corner, where he stopped, and was then standing, when he was shot dead by Real, the plaintiff in error. Real fired four or five shots, two of which produced mortal wounds, one ball going through the head and the other through the breast.

Very soon after, Real was arrested after sharp pursuit. He had a revolver in his hand, five chambers of which were discharged, and one loaded. When arrested, he said he had shot Smedick; if he did not do it, it was not his fault; he tried to, anyhow.

The officer who made the arrest was a witness on the part of the people, and on cross-examination, testified that Real told him, the day after, why he had shot the deceased. He could not swear that he did not tell him the same evening, but was sure he did the next day, and spoke of it as continuing the conversation of the night before. The court refused to receive evidence of what was said by Real the day after the homicide, to which his counsel excepted.

Evidence was given, on the part of the defence, of language used by deceased, some two or three weeks before his death, indicating hostility to Real, and that this language had been repeated to Real.

The defence offered evidence of the arrest and harsh treatment of Real by the deceased, on the evening of July 8, Real being at the time intoxicated, as showing grounds of apprehension on the part of Real, and fear of like treatment on the occasion of the homicide. The evidence was excluded, and the prisoner's counsel excepted.

Witnesses on the part of the defence, but who were not experts, testified to the condition of Real, the afternoon before the homicide, and the day previous, indicating mental disorder or hallucination; one of the witnesses testifying, "I thought he had the horrors;" and they were then asked the following questions: "From what you saw of him that night, what impression did his acts and words make upon your mind; what impression as to the state of his mind did his words and conduct leave upon your mind?" "What impression, as to his condition of mind, did his conduct and acts and words make upon you at the time?" "What did you think as to his state of mind, in consequence of his acts and conduct upon that occasion?" "In what state of mind did you believe him to be, by reason of what he did and said upon

that occasion?" These questions were severally objected to by the counsel for the people, and the objections were sustained, to which several rulings the prisoner's counsel excepted.

Evidence was offered, on the part of the defence, to show a habit of excessive drinking by Real, for days continuously, followed by periods of delirium and insanity; a condition of mind consequent upon drunkenness.

The court held that delirium tremens, at or about the time of the homicide, might be proved, but not the general habit of drunkenness or its consequences, to which the prisoner's counsel excepted.

It was also offered to show that the deceased had beaten and bruised Real on different occasions, and had made threats of violence against him which came to his knowledge. This evidence was excluded, and the prisoner's counsel excepted.

A witness on the part of the defence testified that he witnessed a collision between two men, one of whom was a policeman, at the corner of Thirty-second street and First avenue, at about half-past ten on the evening of the homicide; that the men "clinched," and the policeman raised a club, when a shot was fired and the policeman fell, and then another shot was fired. On cross-examination he was asked: "Have you ever been in the penitentiary?" Objected to by counsel for the prisoner. The court: You need not answer if you do not want to. Defendant's counsel excepts. Witness: I will tell the truth; I was in the penitentiary. Q. How long there? Objected. Objection overruled. Excepted to. A. Four months; innocent of the crime, too."

The prisoner's counsel, among other things, requested the court to charge the jury, "that if the proof fails to show which wound it was that actually killed, the case is not made out according to the indictment. The court refused so to charge, and the prisoner's counsel excepted.

The jury rendered a verdict of murder in the first degree, with a recommendation to mercy.

*Sidney H. Stuart*, for the plaintiff in error, insisted that Justice BARNARD was disqualified from sitting in review of the case at General Term, by reason of section eight of article six of the Constitution as amended; that the amended judiciary article took effect as soon as its adoption was determined by the board of State canvassers; and cited 1 Kent. Com., 458; Sedgw. Stat. and Const. Law, 82; Pomeroy Const. Law, 152; DENIO, Ch. J., *People* v. *Draper* (15 N. Y., p. 546). That the Oyer and Terminer lost jurisdiction by the delay in bringing the indictment into that court, he cited *Banks* v. *Goodwin* (3 Best. & Smith, 548; 113 E C. L. R., 846); 1 Chitty, 751-2; *Northrup* v. *People* (37 N. Y. R., 204). That the evidence must show that death was caused by the particular wound described, he cited Whart. Cr. L., §§ 822, 941, 1064; *Reg.* v. *Bird* (15 Jurist., 193; 2 Eng. Report, 448); *Sanchez* v. *People* (22 N. Y., 149). That it was error to exclude testimony of the impressions produced on the minds of witnesses by the conduct of Real, he cited *O'Brien* v. *People* (36 N. Y., 276); *Clapp* v. *Fullerton* (34 N. Y., 190); *Dewit* v. *Barly* (17 N. Y., 340); and also to exclude evidence of the prisoner's habit of excessive drinking, he cited *People* v. *Eastwood* (14 N. Y., 562), and cases cited. As to the offers to prove harsh treatment and threats on the part of the deceased toward the prisoner, he cited *People* v. *Gonzales* (35 N. Y., 49); Whart. L. Hom., 217; Archbold's Cr. Pr., by Waterman, 901; *Pfomer* v. *People* (4 Park. Cr. R., 558); *People* v. *Rector* (19 Wend., 569); *People* v. *Lamb* (2 Keyes, 360); *Munroe* v. *State* (5 Geo., 85). That the question, on cross-examination, whether a witness had been in the penitentiary was inadmissible, he cited *Newcomb* v. *Griswold* (24 N. Y., 298); *Lee* v. *Chadry* (3 Keyes, 225); *Billenger* v. *People* (8 Wend., 595); *Jackson* v. *Osborne* (2 Wend., 555); *People* v. *Herrick* (13 John, 82); *McDonnel* v. *Evans* (16 Jurist., 103); Queen's case, 2 B. & Bing., 293; *Sainthill* v. *Round* (4 Ex. R., 74); 1 Taylor's Ev., 292; 1 Greenleaf, 457, 463; *Worrell* v. *Parmelee* (1 N. Y., 519); *People* v. *Willey* (3 Hill, 194, 214);

*Com.* v. *Kinnison* (4 Mass., 646); *State* v. *Zellers* (2 Halsted, 220); *West* v. *State* (2 Zabriskie, 212); *Davis* v. *State* 17 Ala., 415); *Com.* v. *Thompson* (Thatcher's Cr. Cas., 28); *U. States* v. *Gilbert* (2 Sumner, 19).

*Samuel B. Garvin*, district attorney, for the defendant in error, as to evidence of impressions made upon the mind of a witness by the prisoner's conduct, cited *Clapp* v. *Fullerton* (34 N. Y., 194), and *People* v. *Eastwood* (14 N. Y., 562). On the question of prior threats and harsh treatment by deceased, he cited *Shorter* v. *People* (2 Comst., 193); *People* v. *Lamb* (2 Keyes, 360). That the question "have you ever been in the penitentiary?" was admissible on cross-examination, he cited *Rex* v. *Edwards* (4 Term. R., 440); *Howard* v. *City Fire Ins. Co.* (4 Den., 502); 1 Carr. & P., 75n; 1 Greenl. Ev., § 459; *Great West. Turnp. Co.* v. *Loomis* (32 N. Y., 127); *La Beau* v. *People* (34 N. Y., 223). That it was not error to exclude proof of the declarations made by the prisoner the day after the event, he cited *State* v. *Tilley* (3 Iredell, N. C. L. R., 424). That, it being apparent the supposed errors could not have affected the result, there ought not to be a new trial, he cited *Gonzales* v. *People* (35 N. Y., 60, and cases there cited); *People* v. *Kennedy* (39 N. Y., 245).

GROVER, J.    Although the case was heard in the General Term of the Supreme Court, before the election in 1869, at which the judiciary article submitted to the electors was adopted, yet the case was not decided until after the canvass of the votes by the State canvassers and the result showing the adoption of the article was announced by that board. The record shows that one of the three justices by whom the General Term was held presided at the Oyer and Terminer at which the plaintiff was tried and convicted, and that he was one of the two justices who concurred in affirming the judgment. The counsel for the plaintiff insists that section eight of the judiciary article took effect immediately, upon

the result of the canvass being announced by the board. If he is right in this, the judgment of affirmance must be reversed, and the cause directed to be reheard in the Supreme Court, for the reason that one of the two justices who concurred in affirming the judgment was, at the time of the affirmance, incompetent to take any part in reviewing the judgment rendered by the Court of Oyer and Terminer, of which he was a member, as a member of the General Term, by section eight of such article. That section provides that no judge or justice shall sit at a General Term of any court, or in the Court of Appeals, in review of a decision made by him or by any court of which he was, at the time, a sitting member. The rule of the common law is, that every law takes effect immediately upon its passage, unless some other time is therein prescribed for that purpose. (1 Kent's Com., 458, Sedgwick's Stat. & Const. Law, 82.) The result of the election showing the adoption of this article by a majority of the votes cast, must, within the meaning of the rule, be deemed its passage. The canvass of the votes cast by the various boards of canvassers as required by law, and announcing the result and certifying the same as required by law, is as much a part of the election as the casting of the votes by the electors. The election is not deemed complete until the result is declared by the canvassers as required by law. When the result was declared by the State board of canvassers, the article was adopted, and under the rule, became operative at once, unless from the nature of the provisions themselves, or those of some other law, it appears that it was to take effect at some future period, or unless it clearly appears that the intention of the framers of the article, and of those by whom it was adopted, was, that it should not take effect until some definite future time. The article in question was framed by the convention convened in 1867, pursuant to a vote of the people, as required by the present constitution and the act of the legislature,(Laws of 1867, chap. 194,)for the purpose of proposing amendments to the constitution, or framing a new one, as by the convention should be deemed expedient

It was provided by section 5 of the act, that when it should be ascertained by the board of State canvassers that any proposition submitted to the people had received a majority of votes in its favor, then that proposition should be declared to be adopted, either as the constitution, a part of the constitution, or an amendment to the present constitution, as the case may be, and that the same should take effect from and after the 31st day of December, 1867, unless the convention should prescribe some other time on which the same should take effect by resolution. This act contemplated that the convention would complete its work and submit the same for the action of the people at the election in 1867. It failed to do this and continued its session for some time subsequent to that election. In 1868 (Laws of that year, chapter 538), the legislature passed an act authorizing the convention to continue its session. In 1868, the convention completed its labors, but the legislature did not, during that year, pass any act providing for the submission of its work, or any part thereof to the people. That body did, however, in 1869, pass such an act, providing for the submission of the entire work of the convention to the people; and by section 5 of the act (chapter 318, Laws of that year), provided that, in case of the adoption of the article in question by a majority of the votes, it should become the sixth article of the constitution of the State. This act is silent as to the time when it should take effect. The article in question was incorporated with other articles designed by the convention to supersede the existing constitution, and to become the future constitution of the State. By the act of 1869, it was all submitted at the election to be held that year, provision being made for a separate vote upon the judiciary, and other articles. By the 5th section of the 14th article it was provided, that this constitution shall be in force, from and including the 1st day of January next, after its adoption by the people. This section related to the entire proposed constitution, the judiciary article included; and had the proposed constitution been adopted, would, of course, have determined the time when all

its provisions would have taken effect. But that portion containing this provision was rejected, and it is, therefore, insisted by the counsel for the plaintiff, that it never had any operation. But its insertion shows clearly that the convention intended that no part of the proposed constitution should take effect until that time. The fact that the legislature submitted the judiciary article to a separate vote, could not affect this intention. Those voting for the proposed constitution, or any part of it, saw the time therein limited for its taking effect, and must have voted for it, or any part of it, in reference to such time. To suppose that those voting for the judiciary article, and against the residue of the instrument, intended that the former should take effect, if adopted upon the announcement of the result, would be absurd. All must have understood that such parts, if any, as were adopted should take effect at the time prescribed, irrespective of what might be rejected. This manifest intention of the framers of the article, and of those adopting it, controls the time of its taking effect. That time was January 1, 1870, as to the provision in question. Other provisions of the article, from their very nature, did not take effect until after that time. As to the latter, it is not necessary now to determine when they became operative. It follows that the justice who presided at the Oyer and Terminer was not incompetent to act as a member of the General Term, when the judgment appealed from was rendered.

The counsel for the plaintiff insists that the Court of Oyer and Terminer before which the plaintiff was tried had no jurisdiction of the case. This position is based upon the ground, that the term at which the trial took place was not the term of the court held next after the making of the order by the Court of Sessions, at which the indictment was found, sending it to the next Court of Oyer and Terminer for trial. The statute (§ 7, 2 R. S., 382), authorizes this order. The making of it vests entire jurisdiction of the case in the Court of Oyer and Terminer, and such jurisdiction continues until by some subsequent action it is transferred to

some other court or the cause is tried. The indictment may be tried at any term of the court subsequent to the making of the order, while the indictment is pending therein.

The counsel further insists that the court erred in refusing to charge the jury, that the proof failed to show which wound it was that actually caused the death, the case was not made out according to the indictment. The indictment contained but one count charging that the killing was effected by shooting the deceased with a pistol in the head. The proof tended to show that the plaintiff in error fired the pistol two or three times at the deceased, inflicting thereby two wounds upon the deceased, one upon the head and one upon the trunk, either of which would have been necessarily mortal, but failed to show which was first inflicted or which actually caused the death. It is true that the evidence must show that the killing was effected by the accused in the manner charged in the indictment, otherwise the accused would be unable to prepare for his defence, and unable to meet the case shown against him upon trial; but where, as in the present case, there is no possibility of his having been misled or in any way embarrassed in his defence by the variance, it will be disregarded. In the present case, the shots were fired almost at the same instant, under precisely the same circumstances, and whether death ensued from the one wound or the other was wholly immaterial. There was, therefore, no error in the refusal to charge as requested.

There was no error in rejecting the testimony offered by the counsel showing the reason assigned by him for shooting the deceased. No rule is better settled than that a party either in civil or criminal proceedings cannot prove his own declarations in his own favor. But when his declarations are given in evidence against him, all that he said in the same conversation explanatory thereof, or tending to discharge himself from the effect thereof becomes competent in his own favor. But the statements offered in evidence by the accused were not made in any conversation into which the prosecution had inquired, or any part of which had been given in evidence.

There was no error in excluding proof that the accused was in the habit at times of drinking to excess, and of the effect upon his mind at times produced by this habit. The evidence, in this respect, was properly confined within a period of a few days of the transaction. Within this period, the accused was permitted to give evidence, tending to show that his mind was temporarily unsound, or that he was delirious from this cause.

A witness introduced by the accused, and who gave material testimony in his favor, was asked by the district attorney upon cross-examination, whether he had not been in the penitentiary, and how long he had been there. These questions were objected to by the counsel for the accused, without a specific statement, calling attention to the fact of there being record evidence. The objection was overruled, and the counsel excepted. The witness answered that he had, and stated the time, adding, that he was innocent of the crime. Waiving the question whether the ground was sufficiently stated, there can be no doubt that this testimony was material, and tended to prejudice the accused by impairing the credit of the witness, and if incompetent, the judgment should be reversed. The counsel now insists, that this point was decided in favor of the accused in *Newcomb* v. *Griswold* (24 N. Y., 298) by this court. It was held in that case, that it was error to overrule the objection of the opposite party to a question proposed upon the cross-examination of a witness, with a view to impair his credit, whether he had not been convicted of petit larceny, and the judgment was reversed upon this ground, the court holding, that if the fact was at all admissible, it could only be proved by the record. The same rule is laid down in Greenleaf's Evidence (vol. 1, § 457), where it is further added, that if the inquiry is confined in terms to the fact of his having been subjected to an ignominious punishment, or to imprisonment alone, it is made not for the purpose of showing that he was an innocent sufferer, but that he was guilty, and the only competent proof of his guilt is the record of his con-

viction. If the rule thus laid down by this author is correct, it is manifest that the exception in the present case was well taken. But I think that such is not the rule. It is well settled, that for the purpose of impairing the credit of a witness, by evidence introduced by the opposite party, such evidence must go to his general character. That proof of specific acts of immorality is not competent, see authorities cited in *Griswold* v. *Newcomb* (1 Greenleaf, § 461). Yet it is held, that for the purpose of discrediting his testimony, the witness may be asked upon cross-examination, as to specific acts. (Id., § 456.) This shows that upon a cross-examination of a witness, with a view of testing his credibility, inquiries are proper as to facts not competent to be proved in any other way. Such inquiries do not relate to the issue directly upon trial, but relate only to the credibility of the witness. They are entirely collateral to the principal issue. As to the former, the same strictness is not required when the evidence is confined to the cross-examination of the witness introduced by the opposite party. In such examination the presumption is strong, that the witness will protect his credibility as far, at least, as truth will warrant. All experience shows this to be so. It would be productive of great injustice often, if where a witness is produced, of whom the opposite party has before never heard, and who gives material testimony, and from some source, or from the manner and appearance of the witness, such party should learn that most of the life of the witness had been spent in jails, and other prisons for crimes, if this fact could not be proved by the witness himself, but could only be shown by records existing in distant counties, and perhaps States, which for the purposes of the trial, are wholly inaccessible. No danger to the party introducing the witness can result from this class of inquiries, while their exclusion might, in some cases, wholly defeat the ends of justice. My conclusion is, that a witness upon cross-examination may be asked whether he has been in jail, the penitentiary, or State prison or any other place that would tend to impair his credibility, and

how much of his life he has passed in such places. When the inquiry is confined as to whether he has been convicted, and of what, a different rule may perhaps apply. This involves questions as to the jurisdiction and proceedings of a court of which the witness may not be competent to speak. This was the point involved in *Griswold* v. *Newcomb*, and the only point in that case. Here the inquiry was simply whether and how long the witness had been in the penitentiary. This the witness knew and could not be mistaken about. His answers in the present case undoubtedly impaired his credit with the jury, as the verdict under the charge given, shows that no credit whatever was given to the testimony The extent of the cross-examination of this character is somewhat in the discretion of the court, and must necessarily be so to prevent abuse. (*La Beau* v. *The People*, 34 N. Y., 223.) This discretion should be liberally exercised with a view to arrive at truth.

There was no error in excluding the questions put to non-professional witnesses, who had testified to facts tending to show the mental unsoundness of the accused, as to what they thought of his state of mind, or their impression as to his state of mind. These witnesses were not competent to give an opinion upon this subject. They were not competent to give an opinion as to whether the facts testified to by them indicated mental unsoundness. (*Clapp* v. *Fullerton*, 34 N. Y., 170 ; *The People* v. *O'Brien*, 36 N. Y., 276.) My conclusion is, that there was no substantial error to the prejudice of the prisoner committed upon the trial. The judgment appealed from must be affirmed.

All concur for affirmance, except SUTHERLAND, who does not sit.

Judgment affirmed.