The People, *ex rel.* William Clark, *vs.* Luther M. Norton.

The word "adoption," as used in section 15 of article 7, of the State constitution, of 1867–8, which declares that "The existing county courts are continued, and the judges thereof in office at the *adoption* of this article shall hold their offices until the expiration of their respective terms," means, "the adoption of this article as a part of the constitution." It does not refer to the time when the votes should be cast, and canvassed, and declared, and the people should have decided to discard the corresponding article in the former constitution, and to put the new one in its place, but to the time when the article should be fully and completely adopted as a part of the constitution.

It means an adoption *consummated* and *completed*, and not one *inchoate* and *imperfect*.

Accordingly, where the defendant was duly elected to the office of county judge of Wayne county, at the general election in November, 1869, for the

The People *v.* Norton.

term of four years, to commence on the 1st day of January, 1870, and took the oath of office, and entered upon the duties of the office, and continued to discharge such duties until the general election in November, 1870, *it was held* that there was no vacancy in the office, to be filled at that election; that the defendant, entering upon such office simultaneously with the adoption of such 6th article of the constitution, and being in, at such adoption, was entitled to hold his office until the expiration of the term for which he was elected.

THIS was an action in the nature of a writ of *quo warranto*, brought for the purpose of removing the defendant from the office of county judge of the county of Wayne, into which office, it is alleged, he has intruded himself "without right or lawful authority," and for the purpose of putting the relator and plaintiff, Clark, in possession of that office, to which he claims to have been lawfully elected.

The action was tried by the court without a jury, in January, 1871. The following facts were agreed upon, by a stipulation signed by the counsel for the respective parties :

1. That previous to the 1st day of November, in the year 1869, George W. Cowles was the lawful county judge of Wayne county, and duly elected and sworn.

2. That the office of county judge of the said county of Wayne became vacant on or previous to the 1st day of November, 1869, but subsequent to the 15th day of October, in that year, by the resignation of the said George W. Cowles, and the due acceptance of said resignation, and on that day was vacant. That on said 1st day of November the Governor of the State duly appointed Charles McLouth to the office of county judge of said county, to fill the vacancy occasioned by the resignation of said George W. Cowles.

3. That said Charles McLouth duly accepted said office, and on said 1st day of November duly qualified, by taking the oath of office required by law, and depositing the same in due form with the clerk of said county of Wayne, with his bond, in due form of law, executed by sufficient sure-

ties, and duly approved, and entered upon the discharge of the duties of said office; and that said Charles McLouth lawfully held and was in said office on said 1st day of November, and continued to be in and hold said office from said 1st day of November until the 1st day of January then next ensuing, and no longer.

4. That at the general election, held according to law on the second day of November, 1869, eight thousand and seven votes were given and cast by the electors of said county of Wayne for a person to fill the office of county judge of said county of Wayne, of which the said defendant received four thousand four hundred and ninety-nine, and said Charles McLouth received three thousand five hundred and three.

5. That on the Tuesday next succeeding said election, the county canvassers of said county of Wayne met at the county clerk's office of said county and organized according to law, and, among other things, canvassed the votes cast at said general election by the electors of said county of Wayne, for the office of county judge of said county of Wayne, and then and there certified, according to law, the result to be as above stated, and duly authenticated their certificate, and thereupon determined that said defendant was, by the greatest number of votes, elected to the office of county judge of said county of Wayne, and did then and there award to the defendant a certificate of their determination as aforesaid.

6. That on or about the 18th day of December, 1869, the defendant took and subscribed the oath of office in due form, before the clerk of said county of Wayne, as county judge of said county of Wayne, and filed the same with said clerk, and at the same time executed, with sufficient sureties, a bond to the people of the State of New York, conditioned for the faithful performance of his duties as surrogate of said county, and in all things complying with the requirements of the statutes in relation to the bonds

of surrogates, upon which bond said clerk duly indorsed the proper certificate of his approval thereof, and filed the same in his office.

7. That said defendant, claiming to be entitled to take and hold the office of county judge of said county of Wayne, by reason of his having received a majority of the votes cast at said election, as above stated, and said canvass of votes, and said determination, and having complied with the requirememnts of the statutes as above stated, on the 1st day of January, 1870, entered upon the discharge of the duties of said office, and has from thence hitherto continued and still continues to exercise the functions and discharge the duties of said office, and that said defendant then was, and still continues to be, a resident of the county of Wayne.

8. That at the general election, held according to law, on the 8th day of November, in the year 1870, one hundred and thirty-eight votes were given and cast by the electors of said county of Wayne, for the office of county judge of said county of Wayne, all of which votes were given and cast by the electors of the town of Huron, in said county, and all of which were received by the said plaintiff William Clark, and no votes were cast for that office for any other person; and that said plaintiff, William Clark, then was, and still continues to be, a resident of said county of Wayne.

9. That on the Tuesday next succeeding said last mentioned general election, the county canvassers of said county of Wayne met at the county clerk's office of said county, and organized according to law, and among other things, canvassed the vote cast at said last mentioned general election, by the electors of the said county of Wayne, for the office of county judge of said county of Wayne, and then and there certified, according to law, the result to be as above stated, and duly authenticated their certificate, but did not thereupon determine whether the said William

Clark was or was not by the greatest number of votes elected to the office of county judge of said county, but·declared that said votes so cast for said William Clark were null and void, for the reason that there was no vacancy in said office.

10. That the on 26th day of November, 1870, the said William Clark took and subscribed the oath of office in due form, before the clerk of said county of Wayne, as county judge of said county of Wayne, and filed the same with said clerk, and at the same time executed, with sufficient sureties, a bond to the people of the State of New York, conditioned for the faithful performance of the duties of the office of surrogate of said county, in all things complying with the requirements of the statutes in relation to the bonds of surrogates, upon which bond the said clerk duly indorsed the proper certificate of his approval thereof, and filed the same in his office.

11. That no notice was given at any time by the Secretary of State, or any other officer authorized by law, to any person or officer, either written or printed, that there was or would be a vacancy in the office of county judge of Wayne county, proper to be filled or supplied, either at the said general election held in November, 1869, or at said general election held in November, 1870, nor was any such notice published in the State paper, or in any other manner.

12. That ever since the canvass of said votes cast at said general election, held in November, 1870, the said defendant, Luther M. Norton, has continually excluded, and still excludes said William Clark from said office of county judge of said county of Wayne.

The judge found the facts to be as stated in the stipulation; and as conclusions of law, he·found that the defendant was entitled to have the office of county judge of Wayne county, for the term of four years from the 1st day of January; 1870.

The following opinion was given by the justice before whom the action was tried.

DWIGHT, J. The constitutional amendment known as the new judiciary article, was adopted subject to the limitation (as to the time of its taking effect) imposed by section 5, article 14, of the proposed constitutional amendment. (*The People* v. *Real*, 42 *N. Y.* 270.) It is as if that limitation had been expressed in, and made part of, the article in question. By its own limitation, therefore, the amended judiciary article, though adopted at the annual election of 1869, was of no effect before the 1st day of January, 1870. Until that day the judiciary article of the constitution of 1846 was of full force and effect. Under its provisions, at the annual election of 1869, the defendant was duly elected to the office of county judge of Wayne county, for the term of four years, to commence on the 1st day of January, 1870. The will of the people in his election, and in the adoption of the constitutional amendment, was simultaneously expressed.

Section 15 of the amendment provides: "The existing county courts are continued, and the judges thereof in office at the adoption of this article shall hold their office until the expiration of their respective terms. Their successors shall be chosen by the electors of the counties for six years." It is contended on the part of the relator that the defendant was not in office " at the adoption of the article;" that the provision above quoted did not therefore apply to him, but to the incumbent of the office, whom he was elected to succeed; that the election of the defendant was thereby rendered nugatory, and that the successor of the judge in office at the time of the adoption of the article must be thereafter elected for the term of six years; that the relator was so elected at the annual election of 1870, and therefore that he, and not the defendant, is entitled to the office in question.

The People *v.* Norton.

It is clear that these propositions cannot be maintained, unless the words " at the adoption of the article," as used in the section quoted, are to be construed to include the time of the casting and canvassing of the votes on the amendment. It must of course be conceded that such is the literal import of the words, and that the article was in fact adopted at that time, as held, in construing another provision of the amendment, in the case of *The People* v. *Real, (supra.)*

But nevertheless, it is clear, I think, that such construction cannot be given to the words as they occur in the provision now under consideration. Constitutional and legislative enactments are to be so construed as to give effect to the evident intention of those who enact them. " That intention is to be deduced from a view of the whole and of every part of the enactment, taken and compared together. The real intention, when actually ascertained, will always prevail over the literal sense of terms, and the reason and intention of the law giver will control the strict letter of the law, when the latter would lead to palpable injustice, contradiction and absurdity." (1 *Kent's Com.* 462.)

It was the evident intention of the framers of the provision in question, and of the people in adopting it, not only that the county courts should be continued, but that judges of those courts should be continued in office in all the counties of the State in which such courts existed, and that without interregnum or suspension.

It will be found impossible to give uniform effect to this intention, except by construing the words " at the adoption of this article," to mean at the time of its taking effect.

In Wayne county, and in three other counties of the State, the term of office of the county judge in office at the time of the election and canvass of 1869, expired on the 31st day of December of that year. In all the other

counties of the State such terms of office extended over periods severally of one, two and three years after that date. In the case of all the last mentioned counties, the provision in question, by either construction, continues the county judge in office. In the case of the four counties falling within the former category, the construction contended for involves the anomaly of postponing the election of judges until after the expiration of the terms of office of their predecessors, leaving the offices vacant in the meanwhile, and providing no mode of filling the vacancies; while at the same time it nullifies the election of judges made simultaneously with the adoption of the provision itself. That construction also involves a palpable absurdity. It makes the provision in question relate to and continue a term of office which terminated before that provision took effect, viz., the tenure of the four county judges whose terms expired on the 31st of December, 1869.

It was clearly not the intention of those who enacted the constitutional provision, to make an exception in the case of the counties whose election of judges chanced to take place in 1869, but to continue judges in office in those counties as well as in the other counties of the State. If, therefore, a judge is continued in office in Wayne county, to what judge did the provision apply? It could not apply to him whose term expired before the provision took effect; it could only apply to him whose term commenced concurrently with the operation of the provision in question.

To construe the words " at the adoption of this article" to mean at the time of its taking effect, gives to the provision considered an effect reasonable, uniform and consistent with the evident intention of its enactors; to construe it as contended- for by the relator, gives it an effect anomalous, absurd, partial and contrary to its evident intention. The elementary rules of constitutional

The People *v.* Norton.

and statutory construction require that it receive the former interpretation. It was urged on the part of the relator that there was reason for the construction contended for, in the fact that the jurisdiction of the county courts was greatly enlarged by the amendment, and that it was not consistent with the intention of the people in adopting it, that the defendant, elected under the old constitution, should assume the increased duties and responsibilities of the new office. But this also is to urge a partial and exceptional operation for the provision in question. In fifty-six counties in the State, under either construction, judges elected to office under the old constitution are continued in the new; five for one year, forty-six for two years, and five for three years. It is equally consistent with the intention of the provision that the four elected in 1869 should be continued for the term of four years.

If the views above expressed are correct, the defendant is entitled to hold the office in question. Having been duly elected in 1869, and having duly qualified within fifteen days after notice of his election, his term commenced with the 1st day of January, 1870. He was in office at the moment when the constitutional amendment took effect; and by its provisions, as I have construed them, he was continued in office during the term for which he was elected.

From the judgment entered upon this decision the plaintiffs appealed.

*Marshal B. Champlain,* (Att'y Gen.) *and W. F. Cogswell,* for the appellants.

I. The article of the constitution in question was adopted when and as soon as the board of State canvassers had declared the result of the election. (*Real* v. *The People,* 42 *N. Y.* 270, *and the cases there cited.*) This took place before the 1st of January, 1871.

II. If the article in question was adopted at the time stated in the above point, then as the defendant was confessedly not in office at that time, he is not one of the judges provided for by the first sentence of the article above quoted.

III. The relator has been chosen as the successor of the judge in office at the time of the adoption of this constitution, (Mr. McLouth,) and as such is entitled to hold the same.

IV. The new judiciary article of the constitution was in force from and including the 1st day of January, 1870, and not previously. It was in force every instant of said 1st day of January. (*The People* v. *Real,* 42 *N. Y.* 270.) Its adoption took place previous to said first day of January. It could no more be in full force without a previous adoption, than a law could be in force without a previous enactment.

V. Section 15 of the new judiciary article provides for the election of all the successors of the county judges in office at the time of its adoption. It necessarily follows that these successors must be elected under its provisions, and while it is in force, and that no one could be the successor of any county judge in office at its adoption, unless he should be elected under its provisions.

VI. The mandate of § 15 of the new judiciary article is, that these successors shall be chosen; that is, that they shall be chosen at a future time. The mandate of this section also requires these successors to be chosen for the term of six years; that their terms shall be six years, and the electors shall have the opportunity of voting for them with reference to that term.

VII. Charles McLouth was in and held the office of county judge of Wayne county at the time of the adoption of the new judiciary article, his term commencing the day before the general election in 1869, and ending with the year 1869. The defendant not having been in

the office under, the old judiciary article, nor elected under the new, is expressly excluded from the office.

VIII. The relator is entitled to the office of county judge of Wayne county, having, by the greatest number of votes, been elected thereto at the general election in 1870, and a vacancy having then existed therein, required to be filled at said general election. (*Const. art.* 10, § 5. *Sess. Laws of* 1849, *ch.* 28 *as amended, ch.* 45. 1 *R. S.* 415, *5th ed. Laws of* 1847, *ch.* 240. 1 *R. S.* 420, *5th ed.*)

IX. By all the acknowledged rules of interpretation and construction, § 15 of the new judiciary article must be upheld in its literal signification. 1. Section 15 is in no respect obscure, uncertain or ambiguous in its import or signification, and is not properly the subject of construction or interpretation. It construes and interprets itself. "Where words are plain and clear, and the sense distinct and perfect arising on them, there is generally no necessity to have recourse to other means of interpretation." (1 *Story on the Const.* 384, § 401.) "Where words are plain, clear and determinate, they require no interpretation." (*Id.* 387, § 405. *See also p.* 383, § 400, *et seq.*) 2. If § 15 is held to be open to interpretation or construction, it is proper to examine it with reference to the objects sought to be attained by it. To examine it with reference to the principles which are presumed to have governed its enactors in its formation and adoption. To compare the words and expressions used in it with the same words and expressions used elsewhere in the judiciary article. To endeavor to ascertain the intention of its enactors, from the whole judiciary article. To look at the history of its formaation, consideration and perfecting. 3. The object of the change in the constitution in relation to the county courts, was to elevate their character and relieve the Supreme Court, by drawing business to the county courts. So the jurisdiction of these courts was made almost equal to that of the Supreme Court, the term of the judges extended from four to six

years, and it was provided that their salaries should be fixed, not by the boards of supervisors, but by law.    To have dismissed all the the county judges and provided for the election of new ones, with reference to the enlarged jurisdiction of the county courts, would have further tended to the attainment of the object.  4.  Sound principle required that where the term of any officer was extended, or the jurisdiction of any court was enlarged, the officer or judge who should take the extended term or exercise the enlarged jurisdiction, should be elected by the people with reference to the longer term and the enlarged jurisdiction.    It is as much the right of the people, under a republican government, to elect their officers with reference to the length of their terms and the extent of their powers and duties, as to elect them at all.  5.  The word " adoption" must be held to be used in the same sense, wherever it occurs in the judiciary article.    It occurs five times in the judiciary article and once in the last section of the proposed constitution, which section, it is held, must be treated as if incorporated in the judiciary article.    If the constitution had been voted upon previous to the general election in 1869, the question would have arisen upon the meaning of the word adoption, where it occurs in § 13, in ascertaining the length of the terms of the justices of the Supreme Court elected in 1869.    If adoption, in the last section of the constitution, is made to mean, as it is claimed to mean in the 15th section, that section will read as follows : " This constitution shall be in force from and including the first day of January next after" it shall take effect.  6.  It is clear from the whole judiciary article, that the convention intended that no one not actually in office at the time of the adoption of the article should hold the extended term fixed by it for judges and justices of the supreme, city and county courts, or exercise the enlarged jurisdiction of the county courts, unless elected by the people with reference to such extended term and

enlarged jurisdiction. The county judges in office at the adoption of the new article were retained to the end of their terms, notwithstanding the jurisdiction of the county courts was enlarged, because it seemed impolitic or unjust to turn them out in the midst of their terms. No such reason existed for letting into the office of county judges, persons elected at the time of the adoption of the new article. The new article seems to have been constructed with the express view to exclude them from office. 7. The history of the passage of the 15th section through the convention, shows that the convention intended that it should have its literal signification. It was first reported substantially as the old judiciary article, except that the legislature were authorized to extend the jurisdiction of the county courts indefinitely; the term of county judges was fixed at seven years, and a provision for continuing the judges "*in office when this article shall take effect,*" was contained in what is now § 25 of the new judiciary article; after the section in relation to county courts had been considered in convention, and the term of the judges fixed at six years, and the jurisdiction of the courts fixed as it now stands, the judiciary article was reported complete. The article was then again sent back to the judiciary committee for amendment and revision. The committee amended the 15th section by making it provide that the judges "in office at the adoption of this article," instead of those in office when the article should take effect, should hold their offices until the expiration of their respective terms, and that their successors should be chosen for the term of six years. If the convention had not intended the change they would not have made the alteration. Can the courts now, since the adoption of the judiciary article, change it back to what the draft was before the last revision in convention? (*See vol. 5 Proceedings of Const. Convention, pp.* 3457, 3773; *vol.* 2 *p.* 1316.) 8. No foundation for the idea of the judge at the circuit,

that the enactors of the constitutional amendment intended that judges of county courts should be continued in office in all the counties of the State in which such courts existed, and that "*without interregnum* or suspension," (supposed to mean without a vacancy,) is found in the new judiciary article. All knew that if a vacancy occurred, the constitution and laws made ample provision for promptly filling it. If the question of the occurrence of a vacancy was considered by the enactors of the article, it was determined by them that the evils arising from the occurring of vacancies were less than the evils of imposing upon county judges, for the term of four years or more, duties and responsibilities with reference to which they had not been elected. The language of the judiciary article clearly shows that the enactors of the article intended that no one should hold the office of county judge unless actually in office at the time of the adoption of the article, or elected under its provisions, and it is of no consequence whether the question of a vacancy was considered or not, and of little consequence whether a vacancy should be produced or not. 9. What the judge at the circuit calls a construction of section 15, is in fact an alteration of that section. The section as it stands, refers to the action of the electors in the adoption of the article. The judge alters it, and makes it refer to the operation of the article itself, by which it is made to take effect. The section provides for the election of the successors of the judges in office in November. The judge alters it and makes it provide for the election of the successors of judges in office in January. 10. The idea of the judge at the circuit, that the effect of the 15th section of the judiciary article, as claimed by the plaintiffs, involves a "palpable absurdity," is erroneous. The object of the enactors of the judiciary article, and the effect of the article, are simply to allow the county judges actually in office at the adoption of the article, to serve out their

The People v. Norton.

terms—to serve out their terms to which they were entitled under the old article, notwithstanding the adoption of the new article. The judges whose terms expired with the year 1869 were not reached by section 15, but were properly referred to for the purpose of providing for the election of their successors. 11. The idea of the judge that the plaintiff's construction makes the counties in which the terms of the judges expire with the year 1869 exceptional, is equally erroneous. By section 15 all the county judges in office at the adoption of the new article are to hold till the end of their respective terms, and all their successors are to be elected under the new article, and for the term of six years. Under the alteration which the judge would make, the counties in which the terms of the judges expired with the year 1869 would be exceptional, the successors of the judges in office at the adoption of the new article not being elected under the new article, and holding only four years.

X. Under the alteration of the 15th section, which the judge would make, Norton could not take the office. He was not in office at the time the new judiciary article took effect. In order to enable Norton to be in office when the new article took effect, Norton must first be in office, and the new article must take effect afterwards. The article was in full force and effect the first instant, the first point of time in the year 1870. Norton was not in office before that. If Norton took office and the judiciary article took effect at the same point of time, Norton was not in office when the article took effect, nor did the article take effect when Norton was in office.

XI. The judgment and order dismissing the complaint should be reversed, and judgment entered that the defendant is not entitled to the office of county judge of Wayne county, and that he be ousted therefrom, and that said William Clark is entitled to and that he be put in possession of the same.

*H. R. Selden,* for the respondent.

The election of the defendant to the office of county judge, at the general election in 1869, was regular and valid, under the constitution of 1846, and the laws then in force.   1. The constitution provides as follows : " There shall be elected in each of the counties of this State, except the city and county of New York, one county judge, who shall hold his office for four years." (*Const. art.* 6, § 14. 1 *R. S.* 53, *Edm. ed.*)   2. In October, 1869, George W. Cowles was county judge of Wayne county, and between the 15th day of that month and the 1st day of November following, he resigned that office ; his resignation was duly accepted, and the office became vacant.   (*Const. of* 1846, *art.* 10, § 8.  1 *R. S.* 122, § 34, *sub.* 2, *Edm. ed. p.* 112.) 3. On the 1st day of November the Governor appointed Charles McLouth to that office, such appointment expiring at the end of the year 1869.   " The legislature shall provide for filling vacancies in office, and in case of elective officers, no person appointed to fill a vacancy, shall hold his office, by virtue of such appointment, longer than the commencement of the political year next succeeding the first annual election after the happening of the vacancy." (*Const. art.* 10, § 5.  1 *R. S.* 61, *Edm. ed.*)   The legislature complied with this direction, so far as the office of county judge is concerned, (there having been before no provision of law on that subject,) by the act of February 3d, 1849, as follows :

" Whenever vacancies shall exist or shall occur in any of the offices of this State, where no provision is now made by law for filling the same, the Governor shall appoint some suitable person who may be eligible to the office so vacant or to become vacant, to execute the duties thereof until the commencement of the political year next succeeding the first annual election, after the happening of the vacancy, at which such officer could be by law elected." (*Laws of* 1849, *ch.* 28, *p.* 26.)   The political year begins on

The People *v.* Norton.

the first day of January. (*Const. art.* 10, § 6. 1 *R. S.* 62, *Edm. ed.*) "All officers elected by the people, unless they shall be elected to supply vacancies then existing, shall enter on the duties of their respective offices on the 1st day of January following the election at which they shall be chosen." (1 *R. S.* 116, § 3.) 4. At the general election held on the 2d of November, 1869, the defendant was duly elected to the office of county judge, and was entitled, by force of the constitutional and statutory provisions above referred to, to enter upon the duties of that office on the 1st of January, 1870, and to hold the office for four years from that time. This vacancy was properly to be supplied at that election. The 8th section of title 2 of the statute providing for "elections other than for militia and town officers," (1 *R. S.* 128,) as amended by the laws of 1847, chap. 240, section 6, (*Laws of* 1847, *p.* 264,) is as follows: "All vacancies in any of the offices named in the first and second sections of this title, (which includes county judges,) except Governor, &c., shall be supplied at the general election next succeeding the happening thereof." (1 *R. S.* 118, § 8, *Edm. ed.*) 5. This vacancy having occurred after the 15th of October, notice of the election could not be given by the Secretary of State; but the want of notice does not invalidate the election. (1 *R. S.* 130, §§ 2 *and* 3, *as amended by chap.* 240 *of* 1847, §§ 7 *and* 8. *Laws of* 1847, *p.* 264. 1 *R. S.* 119, *Edm. ed.*) Those sections, as amended, are as follows: "§ 2. The Secretary of State shall, between the first days of July and September in each year, direct and cause to be delivered to the sheriff, or clerk or county judge of each county, a notice in writing, specifying all the officers (county officers excepted) specified in the first section of title second of this act, whose term of service shall expire on the last day of December thereafter, and a like notice specifying the several officers to be chosen in such county at the next general election. § 3. If any vacancy shall exist in a county, proper to be supplied at

the ensuing general election, he shall in like manner, between the first day of July and the 15th of October previous to such election, direct and cause to be delivered to the sheriff, clerk or county judge of such county, a notice in writing, specifying the cause of such vacancy, the name of the officer in whose office it has occurred, and the time when his term of office will expire; and if any such vacancy shall exist in a district, he shall in like manner direct and cause to be delivered to the sheriff, clerk or county judge of each county therein the like notice." (1 *R. S.* 119, §§ 2, 3, *Edm. ed.*) The vacancy, it will be seen, came too late for notice to be given, and yet the election was required to take place, and was valid without notice. (*The People* v. *Cowles*; 13 *N. Y.* 351, 358, 359.) The constitutional provision under which the election in *The People* v. *Cowles* took place (*Const. of* 1846, *art.* 6, § 13 ; 1 *R. S.* 52, *Edm. ed.*) is not applicable to this case, but the statute above quoted, section 8, title 2 of the election law, is to the same effect, and is of equal force in this respect with the constitutional provision.

The statute appointing the first election of judicial officers, under the constitution of 1846, expressly provides that "no such election shall be invalid by reason of the omission to give any such notice." (*Laws of* 1847, *ch.* 276, § 6, *p.* 307.) The relator in this case is in no position to object to the election of the defendant on account of want of notice. No notice, official or other, appears to have been given in his case, and it is a fair inference from the facts, that the matter was managed artfully, as only 138 votes were cast, and those in only one out of fifteen towns in the county. At the election at which the defendant was chosen, although no official notice was given, it is obvious that full *actual* notice was given, as over 8000 votes were cast for the office, of which the defendant received a majority of over 900. The defendant, therefore, was duly elected to the office of county judge, and was

entitled to hold the office for four years from and including January 1, 1870, the term for which he was elected, unless his right is cut off by the amended judiciary article which taken the place of article 6 of the constitution of 1846, under which he was elected.

II. The new judiciary article of the constitution confirms the right of the defendant to hold the office "until the expiration of the term" for which he was elected. (*Const. art.* 6, *as amended*, § 15. *Voorhees' Code*, 10*th rev. ed. p.* 764.) The language of the section, so far as it bears upon this question, is quoted in the opinion of Judge Dwight. It is difficult to add anything to the argument in favor of the judgment appealed from, contained in that opinion. The absurdity, injustice and inconvenience which would result from the plaintiff's intepretation of the constitution, shows that it cannot be the true interpretation, as such could not have been the intention of its framers. The true meaning of the expression, "at the adoption of this article," unquestionably is, "at the adoption of this article as a part of the constitution of the State," which did not occur until January 1, 1870, at which time the defendant was "in office." (*The People* v. *Real*, 42 *N. Y.* 270.) Prior to that time the people had not adopted the article in question as a part of their constitution; they had merely voted that they *would adopt it*, as such, on that day. In one sense, the vote on the 2d of November may properly be called an adoption; but in a sense equally natural, if not equally literal, the adoption of the article by the people, as a part of their constitution, took place on the 1st of January, 1870. The expression "in office at the adoption of this article," in section 15, has, in my judgment, the same meaning as the words "now in office," in section 6. Taking those words in the latter section *literally*, and looking at the time when the declaration was made, the expression would apply only to the justices of the Supreme Court in office on the

2d day of November, 1869. Four of the justices of the Supreme Court, now acting in that capacity, hold their offices by virtue of the interpretation of the words "now in office," spoken by the electors November 2d, 1869, as meaning "in office January 1, 1870." Is that a less broad departure from the literal meaning of the words than that which we ask for section 15? Both departures, if they be departures, from the literal meaning of the words, (which may be doubtful,) are in accordance with the manifest intention of the framers of the amendment, and are necessary to avoid "injustice, contradiction and absurdity." (1 *Kent's Com.* 462. *Sedg. on Statutory and Const. Law,* 232 *to* 234, *and cases there cited.*) Such latitude of interpretation is not only allowable, but is often indispensable, and the books are full of examples and authorities in its justification. The rule on this subject is well stated by Chancellor Walworth, in *Donaldson* v. *Wood,* (22 *Wend.* 397,) as follows: "Legal hermaneutics, when applied to the construction of statutes, teach us to reject a construction which is contrary to natural justice and equity, or which will necessarily be productive of practical inconvenience to the community, unless the language of the lawgiver is so plain and explicit as not to admit of a different construction." What "inconvenience to the community," as well as what injustice to the persons elected to the office of county judge in the fall of 1869, would be produced by the construction of the constitution insisted upon by the plaintiffs, is well shown by the opinion of Judge Dwight in this case. From the earliest times, statutes have been construed according to the obvious intention of the makers, although such construction might not accord with the literal meaning of all the words of such statutes. No other reporter or law writer has given such careful attention to this subject as *Plowden,* and I give a brief summary of the leading cases reported by him, bearing upon this question, availing myself of the argument

The People *v.* Norton.

of *Hardres*, counsel, in the case *Vere* v. *Sampson et al.,* (*Hardres' Rep.* 205, 208.) *Plow. Com.* 82. It is said by Saunders, J., that though a statute give a penalty, yet things that are not within the words shall be taken within the equity; for that the words are but the image of the law, the life and soul whereof rests in the minds of the expositors. *Plow. Com.* 205, (*Stradling and Morgan's case.*) The intention of the makers of the law is the sure rule of interpreting the law, which the judges must collect, sometimes from the occasion and necessity of enacting it; sometimes from the words themselves, and sometimes from foreign circumstances; and the intention of the law makers must be taken according to what is consonant to reason and discretion. *Plow. Com.* 248, (*Lord Berkley's case.*) What is taken to be within the intention of an act, though not comprehended within the precise words of it, is equivalent to what is within the express words, and as strong. *Plow. Com.* 363, *a,* (*Stowel and Zouch's case.*) Every law consists of two parts, the words and the sense; these two make up the law, and it is the office of an expositor to put such a sense upon the letter as is consonant to equity and right reason. *Plow. Com.* 465, *a,* (*Eiston and Stud's case.*) It is not the words, but the sense, that makes the law; the letter is but the body, the sense is the life of it; the word is but the shell, the sense is the kernel. (*Id. fol.* 466 *b,* 467 *a.*) That equity must of necessity take place in exposition of all laws, and equity makes no difference between penal laws and others, and the best way to expound a law is to consider what answer, in all probability, the law makers would have given to such a question proposed to them. (*See Bacon's Abr. Stat. I,* 6.) Apply that test here, and ask what answer any voter would have given on the 2d of November, to the question whether he intended to continue in office the county judges elected to prior to 1869, and to cut off those elected in 1869. Can there be any doubt what his

answer would have been? By virtue of the answer which we say would be given to that question, four of the justices of the Supreme Court now serving as such, as well as the county judges elected at the same time, hold their offices; for there is no difference, in respect to the bearing of that question, between the expression "in office at the adoption of this article," in section 15, and "now in office," in section 6. The following cases, with many others, recognize the principles upon which our interpretation rests. (*The People* v. *Utica Ins. Co.*, 15 *John.* 380. *Jackson* v. *Collins*, 3 *Cowen*, 89, 96. *Walker* v. *Devereaux*, 4 *Paige*, 252. *Dresser* v. *Brooks*, 3 *Barb.* 451. *Bac. Abr.* title *Statutes*, I, 5, 6.)

*By the Court*, JOHNSON, J. The question on which this case turns is, whether there was a vacancy in the office of county judge of Wayne county, at the general election in November, 1870.

The defendant was regularly elected to that office, at the annual election in 1869, under and according to the constitution and laws then existing and in force. The office of county judge in that county included the office of surrogate of the county also, and the term of office for each was four years. He was elected to fill the vacancy which would otherwise happen, on and after the 31st day of December, of that year, by the expiration of the previous term, and of the office of the then incumbent, to the end that there might be no vacancy in the office, and no interruption to the exercise of the powers and functions pertaining to that court.

On the 18th of December, 1869, the defendant took and subscribed the oath of office, in due form, which was duly filed, and executed the bond required to be executed for the faithful performance of the duties of surrogate of said county, which was duly approved and filed. On the first of January, 1870, he entered upon the duties of the offices

of county judge and surrogate of said county, which duties he has continued to perform, and still continues to perform.

The relator and appellant claims the office by virtue of an election thereto at the annual election in 1870, and insists that the office was then, in law, vacant. If the office was then vacant, it is conceded that he is entitled to it by virtue of such election. If not vacant, the election, so far as that office is concerned, was a nullity. The present constitution provides that "the existing county courts are continued, and the judges thereof, in office at the *adoption of this article*, shall hold their offices until the expiration of their respective terms." (*Art.* 6, § 15.) By the same section it is provided that their successors shall be chosen for the term of six years, and further, that "the county court shall have the powers and jurisdiction *they now possess*, until altered by the legislature." What is the meaning of this term "adoption," as here used, and to what period does it relate? Does it relate to the time when the articles should become a part of the constitution of the State, or to a time prior to that, when it could have no voice, or force, or effect whatever, when the electors decided that it should form part of their constitution, and become of force at a future day. To any mind, this is exceedingly clear. The terms used in this section, "the existing county courts," "at the adoption of this article," and "the jurisdiction they now possess," all speak of, and refer to, the same period precisely, to wit, when the sixth article should become of force as part of the organic law. This, it seems to me, is susceptible of demonstration beyond all reasonable doubt. When this article became of force as organic law, has been happily settled by the court of last resort, and is no longer open to question or controversy. Section 5 of article 14 of the constitution, as adopted by the convention, and proposed by that body for adoption by the electors, was as follows: "This constitu-

tion *shall be in force.* from and including the first day of January next after its *adoption by the people,* except as herein otherwise provided." The electors rejected every part of the proposed instrument, except the sixth article. They refused to adopt article 14, and every other article except the sixth. And yet it was held that inasmuch as it was provided as part of the instrument, that no part of it should be of force until the first day of January after its adoption by the electors, the electors must be presumed to have intended that the portion they did conclude to adopt should be of force on that day, and not before. (*Real* v. *The People,* 42 *N. Y.* 270.)

It is claimed on behalf of the appellant, that it was decided, in that case, that article 6 was adopted when the votes of the electors had been cast, and the result declared by the board of canvassers. But no such thing was determined, and no such question was before the court. All they decided was as to when it became of force, and they refused to give it any retroactive effect. They did not hold that "its adoption by the people," mentioned in section 5 of the rejected article 14, had the same meaning, and referred to the same period, and condition of the instrument, as "the adoption of this article," in the several sections of article 6. As I understand the decision, it is rather the reverse of this. The court certainly held that it was not adopted so as to become a part of the constitution, until the first of January, 1871; and that before that time it had no authoritative voice, or control over the action of the judges, which was regulated and controlled solely by the constitution and laws in force up to that time. Looking at all the provisions of article 6, no one can doubt that the general plan and intention, both of the convention which framed, and of the electors who ratified and accepted, was to have no change in the term of the office, until the incumbent holding such office at the time the article became operative and in force, should have served out the

time for which he was elected; and that every person duly elected and entitled to take office, when such article should become part of the constitution, should take, and hold the same, for the full term which he would be otherwise entitled to hold. No vacancy in any office, under this article, and no interruption in the business of any court, for want of an officer to perform it, was contemplated, but on the other hand was sedulously guarded against. This general intention is expressed in various forms and terms, all referring manifestly to the same point or period of time, to wit, the time when the article should be in force. Thus in section 6, "there shall be the *existing* Supreme Court," "and it shall be composed of the justices *now in office.*" This can mean nothing else than the court existing and the justices in office when the article became operative as a rule. It speaks as of that time, and no other. So in section 7, "at the first session of the legislature *after the adoption of this article,*" provision was to be made for organizing, in the Supreme Court, not more than four general terms. This clearly refers to the same time, precisely, when the article should be fully adopted as part and parcel of the constitution. This must be so, because, otherwise, and according to the construction contended for on behalf of the relator, this duty might have been devolved upon an extra session of the legislature, which the Governor had authority to call, at any time between the completion of the canvass of the votes of the general election of 1869, and the first day of January, 1870, when article 6, had not become operative, and thus the new machinery put in operation before the provision authorizing it had come to have any force or effect. So in section 12, it is provided that the court of common pleas of the city of New York, the superior court of Buffalo, and the city court of Brooklyn "*are continued,*" with the powers and jurisdiction *they now have,*" &c. The superior court of New York shall be composed of the six judges in office

" *at the adoption of this article,*" &c.; the court of common pleas of New York, of " the three judges *then in office,*" &c.; the superior court of Buffalo, " of the judges now in office," &c. And again, " the judges of said courts in office at *the adoption of this article,* are continued until the expiration of their terms." Here it is entirely plain that the three forms of expression, " at the adoption of this article," "then in office," and " now in office," are used to express the same idea, and refer to the same period of time—the time when the article should take effect.

The language of section 15 more particularly under consideration has already been quoted, and it is equally plain that the terms there used, " at the adoption of this article," " the powers and jurisdiction *they now possess,*" refer to the same time. " Now," as there used, must be held to mean the time when the article became operative and in force, and could speak with authority. And " at the adoption of this article," refers, undoubtedly, as I think, to the same time, when the article should be fully and completely adopted as a part of the constitution. This interpretation of this last sentence is, it seems to me, placed beyond all doubt or cavil, by reference to section 25, which provides that " surrogates" and other inferior officers there mentioned, " in office when *this article shall take effect,* shall hold their respective offices until the expiration of their terms." In many counties of this State, of which Wayne county is one, the county judge is both judge and surrogate, and holds and exercises the duties and functions belonging and pertaining to both offices. It would lead to a most gross absurdity to hold that the convention, or the electors, intended, by using this phrase, "shall take effect," to divorce the two offices, in a case like the one under consideration, and allow the county judge elect, when the article should " take effect," to hold the office of surrogate through the term, and not the office of judge. Yet such would certainly be the result, upon

The People *v.* Norton.

the construction contended for by the relator and appellant. The defendant had been duly elected to the office of surrogate by virtue of his election as county judge, and had duly qualified before the article took "effect;" and went into the office at the same moment that such article went into effect. He was therefore in office at that time, or "now in office," as the same idea is elsewhere expressed. Both went in together, and each was therefore necessarily in when the other came in. This seems quite too plain to require the aid of argument. These terms, "when this article shall take effect," are used nowhere else in the judiciary article, and so far as I have been able to discover, nowhere else in the entire instrument, as adopted by the convention and proposed by them for adoption by the people. But the same idea and intention, thus expressed, is expressed very frequently in other forms of expression, both in the judiciary article and in other parts of the instrument as proposed. It is quite competent and proper, when considering the meaning of this word "adoption," as used in the judiciary article, to refer to other articles and sections of the proposed instrument, for the purpose of ascertaining, if possible, in what sense the convention generally used it. I shall not take time to enlarge upon this, but content myself with referring to the same word and term in article 4, sections 4 and 9; article 7, section 6; article 11, section 1, where the same term is used in the same sense, and to express the same idea which the terms "shall take effect," in section 25 of article 6, and "shall be in force," in section 5 of article 14, are used. Indeed such is the primary and natural signification of the word "adoption," as used by lexicographers. It includes both "take effect" and "in force." Thus *Webster* defines "adopt, v. t." "1. To take a stranger into one's family as son or heir; to take one who is not a child and treat him as one. 2. To take and receive as one's own, that which is not naturally so." "Adoption, n.," is

thus defined: "1. The act of adopting, or the state of being adopted; the taking and treating a stranger as one's own child. 2. The receiving as one's own, what is new or not natural." Hence it is seen that the word "adoption," in its primary and most common sense and signification, is a thing consisting of the act of adopting, and its result or effect accomplished. It is no substantive adoption, until the stranger has been taken and become heir. And in this strict and correct sense it was used in the judiciary article in question, by persons who understood the meaning and force of expressions by them used. As the word is used in section 15, and in all other parts of article 6, it is used in its full and complete sense of adoption accomplished. It is not used in any loose or qualified sense, as "adopted by the convention," or "adopted by the people," but "the adoption of this article" in its full sense and significance. It most unquestionably means as there used, "the adoption of this article as part of the constitution." In some sense, it was adopted when the votes were cast, and canvassed and declared, but the adoption then was merely inchoate and incomplete.

The electors had decided to discard the former judiciary article in the constitution, and to put the present one in its place at a future day. Time would ripen this into the complete thing—adoption consummate. And it is adoption consummated and completed, and not *inchoate* and imperfect, which the article and section in question speak of. They speak what they mean, of the time when they should take the place of the discarded article, and have the same right and authority. Until then, adoption was not a thing *in esse;* nor could it be, until the stranger had in fact and law become heir. And this is so, not by any loose or strained definition of words, or interpretation of terms, but by giving them their primary and common meaning and force. The interpretation contended for by the relator and appellant is the one that is loose and

strained, and which necessarily wrests words and terms from their true and common meaning.

I conclude, therefore, that there was no vacancy in the office of county judge of Wayne county at the time of the general election of 1870. The office was then filled. The then incumbent had been regularly elected for the term of four years, to the offices of county judge and surrogate, and was entitled to take such offices on the first day of January previous, and did take them. He went into office at the same moment with the adoption of the article, as, and in place of, the former article on the same subject. He entered upon the offices simultaneously with the adoption of the article, and was in at such adoption, and must consequently hold his offices until the expiration of the term for which he was elected.

I have not found it necessary, in the view I have taken, to invoke the aid of any of the rules and canons of interpretation for making the words agree with, and express, the real intention of the law maker, where, in their literal sense and meaning, the words chosen fail to express fully and completely such intention. To my mind the words chosen are most apt and fitting to express the sense and intention of the convention and of the electors, in regard to the time the article should speak with authority.

I do not perceive that the alteration of sections by the convention, or of the phraseology of some of them, brought to our attention by the appellant's counsel, has any significance or bearing whatever upon the question we have been considering. There is nothing to show that any importance was attached to either by the convention in this respect. If it can have any bearing, it would seem to me to be rather against, than in favor of, the appellant's position.

For the foregoing reasons, I have come to the conclusion that the relator and appellant is not entitled to the

The People *v.* Gardner.

office, and that the judgment at special term should be affirmed, with costs to the respondent.

TALCOTT, J., having been elected to the office of justice of the Supreme Court, at the judicial election in 1869, expressed no opinion.

Judgment affirmed.

[FOURTH DEPARTMENT, GENERAL TERM, at Syracuse, May 1, 1871. *Mullin*, P. J., and *Johnson* and *Talcott*, Justices.]