[Civil No. 4128. Filed December 22, 1939.]

[97 Pac. (2d) 538.]

PIMA COUNTY, a Body Politic and Corporate of the State of Arizona, Appellant, v. WARREN A. GROSSETTA, R. H. MARTIN and J. B. MEAD, Appellees.

532

Mr. J. Mercer Johnson, County Attorney, for Appellant.

Mr. Joseph B. Judge, for Appellees.

Messrs. Houston & Dodd, *Amici Curiae.*

LOCKWOOD, J.—This is an action by Warren A. Grossetta, R. H. Martin and J. B. Mead, hereinafter called plaintiffs, against Pima County, a political subdivision of the state of Arizona, Elliott Dunseath, Herbert F. Krucker, Archie R. Conner, Gerald Jones, Clarence Houston and V. Clare Dodd, well-known members of the bar of the state, and J. Mercer Johnson in three capacities, individually, as county attor-

ney-elect of Pima County, and as representative of the taxpayers of Pima County, hereinafter called defendants, with the state of Arizona intervening through Joe Conway, its attorney general.

The plaintiffs prayed for a declaratory judgment defining the rights, status and legal relations of all of the parties to certain contracts set up in the complaint, and a declaratory judgment as to whether the plaintiffs, as the board of supervisors of Pima County, were authorized and had the power to employ legal counsel to assist the county attorney in certain civil actions in which the county was, or might be, a party.

After various motions, demurrers and dilatory pleadings of almost every conceivable nature, in the course of which J. Mercer Johnson, in all his capacities, upon his motion was dismissed as defendant, the case was heard on its merits before the court sitting without a jury, all parties being represented, and a judgment was finally rendered holding all the contracts referred to in the complaint to be valid, and, therefore, necessarily holding that the county of Pima did have the authority to employ special counsel in these particular legal matters. Thereafter Pima County appealed from the judgment, none of the parties defendant being made parties to the appeal.

The case may be better understood by a statement of its background which, in substance, is agreed by the parties to be as follows: Plaintiffs, during the years 1937 and 1938, comprised the board of supervisors of Pima County, Arizona. During the month of March, 1937, they entered into a contract with Elliott Dunseath and Herbert F. Krucker, two of the defendants, for the purpose of collecting any judgments for jury fees which were of record in the office of the clerk of the superior court of Pima County, the fee of the attorneys to be contingent and payable only out of any recovery. On January 14, 1938, the plaintiffs entered

into a contract with Clarence Houston and V. Clare Dodd, whereby the latter agreed to reopen certain cases in which Pima County was interested, and known as the Griffith cases, and prosecute them to a conclusion, receiving for their services twenty-five per cent. of the amount collected for Pima County by such actions, the county to pay the expense of an appeal to the Supreme Court of Arizona, if one was necessary, not exceeding $250. During the month of March, 1938, the plaintiffs employed Archie Conner and Gerald Jones to advise them as to the right of Pima County to collect certain taxes which plaintiffs believed to be due the county from the Valley National Bank, and on May 4th employed them to bring an action for such taxes, the attorneys' fees not to exceed a maximum sum of $5,000, and an expense not to exceed $2,000, as the case might develop.

All of the counsel so employed commenced performing their parts of the contracts for legal services above referred to, and before this suit was filed Dunseath and Krucker had collected a large amount of jury fees, and were paid for such collection out of the money collected the sum of $771.80. Conner and Jones were paid $150 for their advice given before the contract of May 4th, but Houston and Dodd had not been paid anything on their contract. During all this time Joseph Judge was the county attorney of Pima County, and all the contracts had been entered into with his full approval and consent.

During the primary campaign of 1938, the advisability and validity of these contracts were brought into question, and some doubts having arisen in plaintiffs' minds as to their rights and liabilities on account of such contracts, they ordered Judge to file this action seeking the declaratory judgments as aforesaid, which was done on November 17, 1938. At the inception of the action, all of the parties to the suit, except

J. Mercer Johnson, were anxious that judgment be rendered declaring the contracts valid, the action at that time being one of the well-known "friendly" suits where all the parties, although apparently opposed in interest, are anxious for the same judgment. On January 1, 1939, the county attorney, Joseph Judge, who had advised the board of supervisors when the contracts were made, retired from office. "Now there arose up a new king over Egypt, which knew not Joseph," (Exodus 1:8), to-wit, J. Mercer Johnson, the newly elected county attorney, and from this time on the friendly contest was anything but. The attorney general of the state, believing that his rights had been infringed upon, also hurled himself into the fray as intervener, and the various motions, demurrers and other pleadings became so numerous and involved that the real issues of the original action were almost lost sight of.

We consider first the motion to dismiss the appeal of Houston and Dodd, who were permitted by the court to appear as *amici curiae* since they represented no party to the appeal. They urge upon this point that they were parties to the proceeding in the court below and vitally interested therein as beneficiaries under one of the contracts which is attacked in the action; that the rule of law is that when an appeal is taken all parties to the action who are interested in maintaining the validity of the judgment in the lower court must be made parties on the appeal or it will be dismissed. In support of this, they cite a number of cases, among them being *Hurst* v. *Lakin,* 13 Ariz. 328, 114 Pac. 950; *Lisitzky* v. *Brady,* 38 Ariz. 337, 300 Pac. 177; *Neil* v. *Chrisman,* 26 Ariz. 566, 229 Pac. 92; *Smith* v. *Stilwell,* 9 Ariz. 226, 80 Pac. 333.

Counsel for Pima County admit the general rule but urge that so far as *amici curiae* are concerned, the question of their rights is moot, since in the very

recent case of *State* v. *Griffith, ante,* p. 436, 96 Pac. (2d) 752, decided December 11, 1939, we have held that Pima County and the state of Arizona take nothing by their action, and, therefore, regardless of the validity or invalidity of their contract, they can recover nothing and are not interested in the result of this appeal. We think the objection is well founded. The interest of Houston and Dodd in this case, since the decision in *State* v. *Griffith, supra,* is academic only, and they are not necessary parties to the appeal. The motion to dismiss will, therefore, be denied.

■ We consider next the procedural questions raised in the lower court. The first is that it appears that plaintiff Warren Grossetta had ceased to be a member of the board of supervisors of Pima County shortly after the filing of this action, and that Pima County's plea in abatement on that ground should have been granted and the newly elected supervisor substituted. We think this objection is not well taken. Plaintiffs did not bring this suit in their official capacities as supervisors of Pima County, but as individuals who, because of their actions as such supervisors, might be under a personal liability, by reason of section 790, Revised Code of 1928, which imposes certain liabilities on members of a board of supervisors who order money paid out of the county treasury without authority of law. This liability against plaintiff Grossetta would continue, even though he had left office, and we think there was no reason why his successor in office, who had not been a party to the contracts, should be substituted for him.

■ The next objection raised is that the judgment rendered would not finally terminate any uncertainty or controversy alleged to exist by reason of the contracts under consideration, and that it would not be binding upon any of the taxpayers of Pima County. A declaratory judgment in this case would determine

either that the contracts in question were authorized to be made by plaintiffs and they were, therefore, free from liability thereunder, or that they were not authorized, in which case any taxpayer might bring an appropriate action under section 790, *supra,* to recover any money paid out, and all of the defendants party to the contracts would certainly be barred from any recovery in a future action. The judgment would finally terminate any uncertainty as to the validity of the contracts or the rights and liabilities of the parties to the action by reason thereof, although it might be that under some circumstances further litigation would arise as a result of this judgment.

The next objection is that the plaintiffs were not the real parties in interest because the contracts with the different attorneys were made by Pima County, and not by the members of the board of supervisors. It is true that Pima County is sought to be bound in its corporate capacity by the contracts, and the plaintiffs in making them were merely acting as its agents, but any liability for their action, in case they acted without authority, was an individual one, under section in 790, *supra,* so that they were certainly interested as individuals in determining whether they would be so liable before they permitted any further money to be paid out on the contracts. If, incidentally, this determination should affect the liability of Pima County, that does not take away the right of the plaintiffs to bring the action.

The next objection is that there were three separate contracts with three separate firms of attorneys set up in the complaint, and that there was, therefore, an improper joinder of causes of action. If this action were one at law, seeking a recovery on the different contracts set up therein, the point might be well taken. But it is, in effect, an action to determine whether the plaintiffs as supervisors had the authority

to employ legal assistance, and the judgment which is sought, though multiple in form, is, in reality a single one, though the ultimate effects might be to give rise to three different causes of action in favor of several different parties.

 Having disposed of the purely procedural questions, we come now to the issues upon the merits. The first is whether the contracts were *ultra vires* for the reason that they extended beyond the term of the existing board of supervisors and that of the county attorney, who consented thereto. We have had a similar question under consideration in *Town of Tempe* v. *Corbell,* 17 Ariz. 1, 147 Pac. 745, L. R. A. 1915E 581, and *Olmsted & Gillelen* v. *Helsa,* 24 Ariz. 546, 211 Pac. 589. At first glance it might seem that the opinions therein supported the objection under consideration, but a careful examination will show that the true rule laid down may be stated as follows: Where the contract in question is a unitary one for the doing of a particular and specified act, but its performance may extend beyond the term of the officers making it, if it appears that the contract was made in good faith and in the public interest it is not void because it will not be completed during the term of those officers. If, on the other hand, the contract is for the performance of personal or professional services for the employing officers, their successors must be allowed to choose for themselves those persons on whose honesty, skill and ability they must rely. The contracts in question were not for the employment of the various attorneys as general advisers to the board of supervisors, but were unitary contracts to handle certain specified matters for a fixed compensation and not on a time basis. We think, therefore, they fall within the class of contracts which may extend beyond the term of the contracting officers.

The second question on the merits is whether boards of supervisors have the power at all to employ special counsel to handle legal matters in which the county is interested. It is contended that the county attorney only may act in this capacity. Section 881, Revised Code of 1928, defines his duties. There are nine subdivisions in this section but, of these, 3, 6, 7 and 8 are the only ones affecting proceedings of the nature involved in the contracts set up in the complaint. They read as follows:

"§ 881. Duties. The county attorney is the public prosecutor of the county and shall: . . . 3. draw all indictments and informations, defend all actions brought against the county, prosecute all recognizances forfeited in the courts of record, and all actions for the recovery of debts, fines, penalties and forfeitures accruing to the state or his county; . . . 6. give, when required, his opinion, in writing, to county officers on matters relating to the duties of their offices; 7. keep a register of official business, and enter therein every action, criminal or civil, prosecuted officially, and of the proceedings therein; 8. act as the legal adviser to the board of supervisors, attend their meetings, and oppose claims against the county which he deems unjust or illegal; . . . "

It will be observed that there is no express provision requiring the county attorney to prosecute any civil actions on behalf of the county, though there is one requiring him to defend any which may be brought against it, nor is even this latter power said to be exclusive.

The powers and duties of boards of supervisors are set forth in section 774, Revised Code of 1928. Subdivision 14 of the section reads as follows:

"Powers of boards enumerated. The board of supervisors, under such limitations and restrictions as are prescribed by law, may: . . . 14. direct and control the prosecution and defense of all actions to which

the county is a party, and compromise the same;
. . . "

It will be seen by this subdivision that the board of supervisors is given the final authority to direct and control all actions in which the county is a party, either as plaintiff or defendant. It may frequently occur that the county attorney has one idea as to the advisability of bringing an action for the county, or as to how it should be handled, while the supervisors have a different one, so that there would be a lack of harmony between them. Under such circumstances it would seem that the public interest would require that the men who had the final authority in all matters in regard to the action should be allowed to choose the counsel who actually handled its legal phases. Since there is no specific prohibition against it in the statutes, we think subd. 14, *supra,* gives implied authority to the board of supervisors in its discretion to employ counsel in the handling of all matters to which the county is a party.

This brings us to the last and most difficult question. It is urged that the complaint shows on its face that the contracts were entered into at a time when no funds were budgeted therefor, and created an obligation in excess of the amount of the budget. We have held repeatedly that no debt, liability nor obligation in excess of the budget provided by section 3098, Revised Code of 1928, can be validly incurred for any purpose whatever unless (a) authority to exceed the budget is given by the tax commission, under section 3099, Revised Code of 1928, or (b) sources of revenue other than the amounts proposed in the budget to be raised by taxation are already available as a means of liquidating the obligations and liabilities thus incurred. *Bank of Lowell* v. *Cox,* 35 Ariz. 403, 279 Pac. 257; *American-LaFrance etc. Corp.* v. *City of Phoenix,* 47

Ariz. 133, 54 Pac. (2d) 258; *City of Phoenix* v. *Kidd,* (Ariz.) 92 Pac. (2d) 513.

So far as the contracts with Dunseath, Krucker, Houston and Dodd are concerned, except so far as the $250 to be paid by the county for expenses of an appeal in the Griffith case, we think they are not within the inhibition of the budget law, for all sums to be paid on account of these contracts were only payable when, if and as the county received money from specified sources outside of taxation, and from that money only. The contract with Conner and Jones, however, and the $250 to be paid on appeal in the Griffith case, under the contract were direct obligations of the county, and unless it appears in the record that the money to pay this was on hand at the time the contracts were made, insofar those contracts were *ultra vires* and void. We turn, therefore, to the record to see whether it appears that such funds were on hand. The contract with Conner and Jones was made on May 4, 1938, and incurred a maximum liability on the part of the county of $7,000, while that with Houston and Dodd was made in January, 1938, and incurred a liability of only $250, except as to actual recoveries. The testimony of J. B. Mead, one of the plaintiffs in the case, shows that at all times from August, 1937, to the end of the fiscal year on June 30, 1938, there was never less than $20,000 surplus miscellaneous revenue on hand over and above all moneys received through taxation during that fiscal year which was available for the payment of fees under the contract. We think this brings the contracts within the exception above referred to of money being actually on hand to pay the amount contracted for out of funds not raised by taxation during the current budget year.

There are other questions raised by the briefs, but we think in view of what we have said they require no discussion.

Since none of the objections made to the validity of the contracts in question are valid ones, the trial court was correct in rendering its judgment that the contracts questioned were validly entered into on behalf of Pima County, acting through the plaintiffs as its board of supervisors, and were binding upon the county.

The judgment is affirmed.

ROSS, C. J., and McALISTER, J., concur.