American Federation of State, County and
Municipal Employees, District Council
No. 33, etc., v. Philadelphia

Before Milner and Mawhinney, JJ.

*Frank F. Truscott*, for plaintiffs.

*Abraham Wernick*, deputy city solicitor, and *Abraham L. Freedman*, city solicitor, for defendant.

MILNER, J., December 2, 1952.—The petition filed in this case is for a declaratory judgment declaring the rights of the members of plaintiff unions, employes of the City of Philadelphia, under an agreement of December 14, 1944, as amended by an agreement of December 4, 1951. To the petition defendant city has filed an answer and plaintiffs have entered a rule on defendant to show cause why judgment should not be entered upon the pleadings in favor of plaintiffs, which rule, after hearing the arguments of the parties, we are now considering.

The essential facts necessary to the determination of the issue are set forth in the pleadings and are not disputed. The questions raised by the pleadings are questions of law to which we will address this opinion.

These are the essential facts. On December 14, 1944, pursuant to an ordinance of council authorizing the same, plaintiffs and defendant entered into a contract "for the purpose of avoiding industrial disputes and of bargaining collectively with ·regard to wages, hours and working conditions of certain employes of the city." Paragraph 1 of the contract relating to "Hours of Work" provides as follows:

"1. The regular work week for the employees shall consist of a regular work week of forty-eight (48) hours. The forty-eight (48) hour work week shall consist of six (6) days of eight (8) hours a day, Monday to Saturday, inclusive."

The agreement provided that it should continue in force until December 31, 1944, and thereafter from year to year, unless either party to the agreement gave 60 days' written notice prior to any yearly anniversary date thereafter of the termination of the agreement. It also provided that either party could reopen and negotiate the issue of wages at least 90 days prior to the yearly adoption of the Budget Ordinance, i.e., December 15, 1944, or December 15th of any subsequent year. The agreement has been automatically continued from year to year until and including the year 1952.

As a result of negotiations with plaintiffs, an ordinance of the Council of the City of Philadelphia dated October 29, 1951, was enacted authorizing and directing the Mayor to execute an amendment to the abovementioned agreement in regard to hours of work as set forth in the ordinance. Pursuant to the direction contained in this ordinance and after negotiations with plaintiff unions the parties reduced to writing the amendatory agreement of December 4, 1951, which pertinently provided as to hours of work, in the identical language of the ordinance as follows:

"1. It is agreed by and between the parties hereto that paragraphs 1, 2 and 3 of the Section denominated 'Hours of Work' of the said written contract [1] (being the said section in its entirety) shall be amended to read as follows:

" *'Hours of Work*

" '1. The regular work week for the employees shall consist of a regular work week of forty (40) hours

consisting of five (5) days of eight (8) hours each, Monday to Friday, inclusive.

" '2. If it becomes necessary, because of insufficient funds in the applicable appropriation for the payment of employees in any of the bureaus affected by this agreement at any time during the year, and in order to provide insofar as practicable a forty (40) hour work week for each of the remaining weeks in the current year, a sufficient number of employees may be laid off on the basis of seniority and ability, provided that where ability in the opinion of the employer is relatively equal, then seniority shall prevail subject to review under the provisions of the section on "Grievance Procedure" herein. The business agent of the union involved shall be advised of the intended lay-off and given the opportunity of review by the Employer.

" '3. Overtime for all employees shall be compensated for at the rate of time and one-half times the regular rate of pay and shall commence immediately upon the completion of eight (8) hours of work on any work day, or five (5) days in any work week, except for work performed on Sunday which shall be double time.'

"2. All of the other terms, covenants and conditions of the said written contract [1] shall be and remain in full force and effect.

"3. This agreement of amendment shall become effective on January 1, 1952."

On April 17, 1951, the electors approved the Philadelphia Home Rule Charter, which by its terms was to become effective January 7, 1952. This charter was adopted pursuant to the provisions of the First Class City Home Rule Act of April 21, 1949, P. L. 665, 53 PS §3421.1 et seq. Defendant contends that the mayor and city council had no power to bind the city by the

---

[1] Reference here is to the original contract or agreement of December 14, 1944.

Ordinance of October 29, 1951, and the agreement of December 4, 1951, beyond midnight of January 6, 1952. On January 7, 1952, the new Home Rule Charter took effect and a new mayor and city council were inducted into office. In defendant's answer reference is made to provisions in the Home Rule Charter as follows: Section 4-300(1)(b) and (c) and 2(a) which provide that an administrative board (consisting of the mayor, managing director and director of finance) shall approve pay plans, hours of work, payment of extra compensation, the hours when offices of the city government shall open and close; section 7-400, which provides that civil service regulations shall be prepared by the personnel director pertaining to position classification, pay plans, hours of work, etc., and section 7-401(4), which provides that the civil service regulations shall provide for hours of work, holidays, attendance regulations, etc. These charter provisions place in the administrative board, the civil service commission and the personnel director powers that previously were lodged with the city council and mayor under the previous city charter of 1919.

The personnel director appointed under the provision of the Home Rule Charter, on January 7, 1952, issued Regulation XXVII of the Philadelphia Emergency Civil Service Regulations which provides as follows:

"Section 2. Existing Pay Plan

"Until a pay plan as prescribed in these emergency regulations has been prepared and adopted, the pay plan in effect immediately prior to January 7, 1952 shall operate as the pay plan prescribed in these regulations."

He also issued Supplemental Emergency Regulation A of the Supplement to Philadelphia Emergency Civil Service Regulations issued on January 9, 1952, providing as follows:

"Commencing Jan. 7, 1952 the hours of work and the rates of pay and the determination of compensation of all city employees shall be as legally established on Oct. 26, 1951. This supersedes Section 2 entitled 'Existing Pay Plan' of Regulation XXVII of the Emergency Regulations."

It is averred in plaintiffs' petition that defendant has failed and refused to recognize the validity of the aforesaid amended agreement and has forced the city employes who are members of plaintiff unions to work a 48-hour week and in its answer defendant admits that the provisions of the amendatory agreement have been rejected "after midnight, January 6, 1952, because they are invalid and not binding. . . ." The impasse in the relations between the current city administration and its employes who are members of plaintiff unions is reflected by the pleadings and the facts culled from them as above set forth. There is present an actual controversy in which the differences have reached the stage of antagonistic claims, actively pressed on one side and opposed on the other, and the matter before us thus presents the ripening seeds of an existing controversy. The remedy under the Uniform Declaratory Judgments Act of June 18, 1923, P. L. 840, as amended and supplemented, is properly sought.

We shall next consider the reasons advanced by defendant in support of the refusal to recognize the validity of the aforesaid amendatory agreement.

Defendant maintains that the amendatory agreement is against public policy and void because it was authorized by the outgoing mayor and council within a short period of time before a new city administration took over. In the first place the mere fact that the amendatory agreement was authorized by the outgoing city council in October 1951 and the new administration took over in January 1952 does not of itself carry

with it any sinister implications. There must be something more than a period of time to impute to a transaction the stigma of being void against public policy. The real questions are: Why was it adopted and what were the surrounding conditions? When we examine the cases cited by defendant, this becomes apparent. In McCormick v. Hanover Township, 246 Pa. 169 (1914), the Board of Supervisors of Hanover Township entered into a contract on December 15, 1910, engaging Peter J. McCormick and another as counsel for the next ensuing fiscal year. The Supreme Court, in holding the appointment void, said (at p. 173):

"Under usual and ordinary conditions a board of supervisors changes with each fiscal year by the expiration of the term of service of one supervisor, to whose place a newly elected supervisor succeeds. Therefore the contract with the plaintiff was for the services to be rendered under a succeeding administration which was thereby denied the right of choosing its own legal assistants. That this was in excess of the power of the contracting board is established by abundant authority."

The court also stated:

"So far as appears there was nothing in the situation calling for haste or expedition in the selection of counsel."

We have no such situation in the case at bar. Plaintiffs here are not attempting to foist legal counsel upon the new administration. Moore v. Luzerne County, 262 Pa. 216 (1918), also cited by defendant, involved a situation similar to that in the McCormick case with regard to a contract of the county commission with an engineer to supervise, etc., construction of county roads under commissioners who took office after the expiration of the existing term of those who entered into the contract. In the case at bar we are concerned with working men and women in the employ of the

present city administration, as will be referred to more fully later on in this opinion.

In the case at bar the amendatory agreement of December 4, 1951, in paragraph 2 provides that all the other terms, covenants and conditions of the written contract of December 14, 1944, shall be and remain in full force and effect. The agreement of December 4, 1951, is therefore merely an amendment to a contract entered into on December 14, 1944. In paragraph 13 of plaintiffs' petition it is averred:

"13. That for many years prior to October 29, petitioner continuously negotiated with the mayor, city council and other city officials in an effort to effectuate a 40-hour minimum work week with no decrease in pay for the city employes whom petitioners represent."

Defendant in its answer to this averment states:

"13. Defendant is advised that the averments of this paragraph are immaterial and irrelevant to the issue involved and therefore require no answer."

This is tantamount to an admission. And the averment *is* material and relevant to the question of the good faith of council and the mayor in entering into the amendatory agreement. The aim of organized labor and working men generally to have the uniform application of a 40-hour work week to industry, with Saturdays free from work, and overtime pay for work in excess of 40 hours a week, is so well known that we can well take judicial notice of it. The 40-hour week has become generally accepted in most industries and businesses and has been made the criteria in many laws and contracts throughout the United States fixing the hours of labor. In yielding to the demand for a 40-hour week council and the mayor followed the enlightened trend of the times in the matter of labor or industrial relations and made a decision which obviously had been too long postponed, especially

as was stated at the argument, since there had been a strike, and threats of a strike by dissatisfied municipal employes who were seeking to obtain recognition of the union's goal of a 40-hour week. The new administration will undoubtedly have to meet the same demands when it composes its budget for the year of 1953. We are at a loss to discern anything sinister or against public policy in entering into the amendatory contract. Nor was there undue haste. It will be recalled that the original contract of 1944 provided that it could be terminated at the end of any year by either side giving to the other 60 days' written notice prior to December 31st of any current year, in default of which it would continue in force for another year and it was agreed that:

"The Mayor and City Council shall arrange meetings with the union in order to discuss the requests of the union, in re: the issue of wages. In order to provide sufficient time and opportunity for a mature discussion of the requests of the union, such meetings shall be arranged to commence at least ninety (90) days prior to the yearly adoption of the Budget Ordinance."

The period of the year for council to consider the renewal of the agreement with plaintiff unions and the adoption of a budget for the ensuing year was therefore the period it chose to do so in this case, viz., October of 1951. It was thereafter reduced to writing and signed by the mayor on December 4, 1951. During the entire year of 1951 it was the duty of the then existing mayor and the then existing council to make provision for the proper running of the municipality. They were operating under the Charter Act of June 25, 1919, P. L. 581, 53 PS §2921. Under that act of assembly it was their duty between October 15, 1951, and December 15, 1951, to prepare a budget and set the machinery in motion to collect the taxes to meet that budget for the

succeeding year of 1952. Every official act until their tenure of office expired on January 7, 1952, was as valid as any other act performed during their term of office. The demands of the city employes for a 40-hour week, if granted, brought with them the necessity of providing the funds to meet any additional expense entailed in granting of their demands. The budget-making period was therefore the proper time for council to consider the amendatory agreement and the budget changes necessary to carry it into effect. Council did take cognizance of this fact and did provide in the budget for 1952 an appropriation which was estimated by plaintiff unions sufficient to meet the increase in the city's expenses caused by the adoption of the amendatory agreement. The new administration was not left with a contract for which there were no funds provided to meet payments called for by it. This leads us to defendant's second contention.

Defendant contends that the petition is not self-sustaining because it does not aver that there was a sufficient appropriation by the new city government to pay the required salaries. Defendant cites Thiel v. Philadelphia, 245 Pa. 406, and Cummings et al. v. Scranton et al., 348 Pa. 538. Theoretically, of course, the creation of a 40-hour work week does not necessitate any increase in the amount of money to be paid the city employes, but the ordinance approved by the mayor under the old charter for the adoption of a financial program for the City of Philadelphia for the year 1952 and making appropriations to carry the program in effect, provided, inter alia, under the heading, Department of Public Works, in which department the members of plaintiff unions were employed, as follows:

"That Employees who are now receiving compensation for forty-eight hours per week shall not receive less weekly compensation under the forty-hour work week."

An ordinance was passed by city council and approved by the mayor on January 2, 1952, amending the ordinance of October 29, 1951, to read as follows:

"That on and after January 1, 1952, the standard work week of the employees of the City of Philadelphia and of the departments, bureaus, boards, commissions and other agencies thereof shall consist of forty hours of work."

It naturally follows that if the employes are obliged to work overtime to do the work done under the old schedule of hours or additional employes are found necessary the cost to the city will be increased. Council and plaintiffs estimated this increased cost at $1,500,-000. Council therefore made an appropriation in that amount to meet this increased cost for the fiscal year of 1952 in the form required under the provisions of the new Home Rule Charter, i.e., by lump sum appropriation rather than by a line-by-line appropriation as was the custom under the 1919 Charter.

Paragraph 12 of plaintiffs' petition for declaratory judgment avers as follows:

"In the ordinance passed by city council and approved by the Mayor of the City of Philadelphia on December 14, 1951, for the adoption of a financial program for the City of Philadelphia for the year 1952 and making appropriations to carry such program into effect, it is provided inter alia under the heading, Department of Public Works, as follows:

" 'That employees who are now receiving compensation for forty-eight hours per week shall not receive less weekly compensation under the forty-hour work week'."

This ordinance, of which we take judicial notice as to all its provisions under the authority of the Act of April 8, 1941, P. L. 16, sec. 1, 28 PS §301, is the Budget Ordinance of the City of Philadelphia for the year 1952 and consequently not only adopts a financial pro-

gram for the city but also makes appropriations to carry the financial program into effect for the year 1952. Therefore, when this Ordinance was adopted by city council and approved by the mayor on December 14, 1951, all sums and figures stated therein were appropriated at that time. There was appropriated in this ordinance to the department of public works for personnel services the sum of $19,627,001. This appropriation was made under the new method called for by the new charter of appropriating lump sums to departments and not identifying the amounts line by line. In this $19,627,001 appropriation was included the $1,500,000 to take care of the estimated increase in the weekly compensation necessitated by the 40-hour work week. Paragraph 12 of plaintiffs' petition for declaratory judgment, therefore, does allege that there was an appropriation to provide for the 40-hour week for city employes.

Bearing in mind that this matter is before us on a motion for judgment on the pleadings, it will be seen that in paragraphs 33 and 35 of defendant's answer to plaintiffs' petition for declaratory judgment specific admissions are made that city council did make a lump sum appropriation of $1,500,000 to the then department of public works in order to provide funds to pay employes on a 40-hour per week basis.

Paragraph 33 of defendant's answer reads as follows:

"(33) Upon information, it is averred that in order to meet the increased cost payable under table IV of exhibit 'A' attached hereto, council made a lump sum appropriation of $1,500,000 to the then department of public works, which the officials of the plaintiff union estimated would be sufficient to provide for the additional pay becoming due to Union members during 1952 under the increased scale."

Paragraph 35 of defendant's answer provides:

"(35) In the final budget, the $1,500,000 appropriated to meet the increased cost under table IV of exhibit 'A' is merged in a lump sum item for personal services. This appropriation has attached to it the following provision:

"'That employees who are now receiving compensation for forty-eight hours per week shall not receive less weekly compensation under the forty-hour work week'."

There can be no doubt, therefore, that defendant in unmistakable terms admits that city council did appropriate funds to assure a 40-hour work week for city employes. The additional appropriation of $1,-500,000 was clearly earmarked by city council to be for personal services since it provided in the Budget Ordinance for the year 1952, which was adopted and approved by the mayor on December 14, 1951, the following:

"That employees who are now receiving compensation for forty-eight hours per week shall not receive less weekly compensation under the forty-hour work week."

The Budget Ordinance provides further that any payment made in accordance with table IV (exhibit A annexed to defendant's answer) shall apply to all employes covered by section 3 of the agreement entered into under provisions of the Ordinance of October 29, 1951. There is also no doubt that it was averred by plaintiffs and likewise averred by defendant that city council did so appropriate the funds deemed necessary. Defendant, however, contends that the $1,500,000 appropriation is insufficient to meet all the costs to the city if employes who are receiving compensation for 48 hours per week shall not receive less weekly compensation under the 40-hour work week. All lump sum appropriations are calculated estimates and it is impossible to estimate the precise amount that will be neces-

sary to operate a given department of a city for the coming year. In the past it has frequently been necessary to make additional appropriations during the fiscal year or to transfer funds from one item in the budget to another to make up deficiencies in appropriations. Defendant also overlooks the provision in the amendatory agreement contained in subparagraph 2 under Hours of Work, reading as follows:

"2. If it becomes necessary, because of insufficient funds in the applicable appropriation for the payment of employes in any of the bureaus affected by this Agreement at any time during the year, and in order to provide insofar as practicable a forty (40) hour work week for each of the remaining weeks in the current year, a sufficient number of employees may be laid off on the basis of seniority and ability, provided that where ability in the opinion of the employer is relatively equal, then seniority shall prevail subject to review under the provisions of the section on 'Grievance Procedure' herein. The business agent of the Union involved shall be advised of the intended lay-off and given the opportunity of review by the employer." Also, the fact that manifestly no order can be or will be made here that imposes upon the present city government an obligation to pay out more in carrying out the provisions of the amendatory agreement than has been appropriated for the purpose. See Leary v. Philadelphia et al., 314 Pa. 458, 473 (1934) ; Miller v. Philadelphia, 231 Pa. 196 (1911).

The First Class City Home Rule Act of April 21, 1949, P. L. 665, 53 PS §3421.11, in section 11 provides that "Any new charter or amendments to the charter of a city thus proposed, which are approved by a majority of the qualified electors voting thereon, shall become the organic law of the City at such time as may be fixed therein and all courts shall take judicial notice thereof. . . . No contract existing at the time of the

adoption or amendment of a charter by a city under the provisions of this act shall be affected thereby, but such contract, shall have the same force and effect and be of the same validity as if such charter had not been adopted or amended."

The new Philadelphia Home Rule Charter was "approved by a majority of the qualified electors voting thereon" on April 17, 1951, and it, by its terms, took effect and became the "organic law" of the city on January 7, 1952. Counsel for defendant argues that the word "adopted", as used in the last sentence of the above quotation from the Enabling Act of 1949, refers to April 17, 1951, when it was (to use the words of the section of the act in which it is used) "approved by a majority of the qualified electors voting thereon." It is then urged that the ordinance authorizing the execution of the amendatory agreement not having been adopted until October 29, 1951, it does not come within the protection of this section. Reading the section as a whole we are of the opinion that the reasonable interpretation of it is that April 17, 1951, is considered the date the charter was "approved" and January 7, 1952, when it took effect and became the "organic law of the city", is the date it was adopted within the meaning of the Enabling Act and the Home Rule Charter. If the legislature had intended that the adoption date be April 17, 1951, the date of its approval by the electors, it would have used the word "approval" instead of "adoption" in the phrase, "No contract existing at the time of the adoption or amendment of a charter by a city under the provisions of this act shall be affected thereby . . .", in order to be consistent in its phraseology, inasmuch as in the same section 11 of the Enabling Act it used the words "approved by a majority of qualified electors voting thereon" in referring to the event that happened on April 17, 1951, when the electors of Philadelphia voted on the charter. In Bouvier's

Law Dictionary, third revision, vol. I, p. 148, it is stated:

"The word 'adoption' in a state constitution providing for continuance in office of judges in office at the adoption of the constitution means when it is fully consummated and complete—not inchoate and imperfect; People v. Norton, 59 Barb. (N. Y.) 169.

" 'The primary and natural signification of the word adoption . . . includes both take effect and in force'; People v. Norton, 59 Barb. 169."

In the well reasoned opinion by Johnson, J., in People v. Norton, supra, pages 195, 196 and 197, the court comes to the conclusion that adoption means the effective date of the constitution and not the date of approval by the electors, in the following language:

"Indeed such is the primary and natural signification of the word 'adoption,' as used by lexicographers. It includes both 'take effect' and 'in force.' Thus Webster defines 'adopt, v.t.' '1. To take a stranger into one's family as son or heir; to take one who is not a child and treat him as one. 2. To take and receive as one's own, that which is not naturally so.' 'Adoption, n.,' is thus defined: '1. The act of adopting, or the state of being adopted; the taking and treating a stranger as one's own child. 2. The receiving as one's own, what is new or not natural.' Hence it is seen that the word 'adoption', in its primary and most common sense and signification, is a thing consisting of the act of adopting, and its result or effect accomplished. It is no substantive adoption, until the stranger has been taken and become heir. And in this strict and correct sense it was used in the judiciary article in question, by persons who understood the meaning and force of expressions by them used. As the word is used in section 15, and in all other parts of article 6, it is used in its full and complete sense of adoption accomplished. It is not used in any loose or qualified sense, as 'adopted by

the convention,' or 'adopted by the people,' but 'the adoption of this article' in its full sense and significance. It most unquestionably means as there used, 'the adoption of this article as part of the constitution.' In some sense, it was adopted when the votes were cast, and canvassed and declared, but the adoption then was merely inchoate and incomplete.

"The electors had decided to discard the former judiciary article in the constitution, and to put the present one in its place at a future day. Time would ripen this into the complete thing—adoption consummate. And it is adoption consummated and completed, and not inchoate and imperfect, which the article and section in question speak of. They speak what they mean, of the time when they should take the place of the discarded article, and have the same right and authority. Until then, adoption was not a thing in esse; nor could it be, until the stranger had in fact and law become heir. And this is so, not by any loose or strained definition of words, or interpretation of terms, but by giving them their primary and common meaning and force. The interpretation contended for by the relator and appellant is the one that is loose and strained, and which necessarily wrests words and terms from their true and common meaning."

The Statutory Construction Act of May 28, 1937, P. L. 1019, article 4, sec. 51, 46 PS §551, provides:

"When the words of a law are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.

"When the words of a law are not explicit, the intention of the Legislature may be ascertained by considering, among other matters . . . (6) the consequences of a particular interpretation . . .".

It seems clear that the legislature had declared unequivocally in section 11 of the Enabling Act that the adoption date was the effective date of the charter

when it became the "organic law of the city" and not the date of approval of the charter by the electors of Philadelphia. However, even if it is assumed arguendo that there is ambiguity as to whether the word "adoption" means effective date or approval date, under the above-quoted section of the Statutory Construction Act, the same result is reached, because if section 11 of the Enabling Act is so construed as to make the adoption date the equivalent of the approval date the consequences would be disastrous. By implication any contract entered into subsequent to the adoption of the charter would be affected by the charter. If adoption means the approval date, April 17, 1951, the result would be paralysis of municipal activities and business for the remainder of the year 1951, since private corporations and individuals would be unwilling to contract or make any commitments with the City extending beyond January 7, 1952, the effective date of the charter, for fear that such contract or commitment would be nullified by the provisions of the Philadelphia Home Rule Charter and abrogated by the incoming administration.

It must be borne in mind also that the amendatory agreement of December 4, 1951, provides in paragraph 2 that all of the other terms, covenants and conditions of the written contract of December 14, 1944, between the City of Philadelphia and plaintiffs shall be and remain in full force and effect. The agreement of December 4, 1951, is therefore merely an amendment to the December 14, 1944, agreement and consequently relates back to December 14, 1944, which, of course, is many years prior to April 17, 1951, the date of the approval of the charter by the electors. We are fortified in our conclusion that the amendatory agreement remains in full force and effect under the present government of the City of Philadelphia by a provision in the Home Rule Charter which the electors approved, which reads as follows:

"*Section A-108.   Contracts and Obligations.*   All existing contracts and obligations of the officers, departments, boards, commissions, bureaus or divisions abolished by this charter shall remain in full force and effect, and shall be performed by the officers, departments, boards and commissions to which the rights, duties, powers and obligations of such abolished officers, departments, boards, commissions, bureaus or divisions are transferred."

The annotation to the above section in the copies of the charter authorized by the Philadelphia Charter Commission states that "Reorganization is not intended to terminate or suspend existing contracts and obligations."   It will be noted that the Home Rule Charter in providing that the new administration taking office under the charter shall assume the obligations of "all existing contracts and obligations" does not restrict the existing contracts to those in force at the time of the approval of the charter by the electorate.   For the reasons given above we are of the opinion that the agreement of December 4, 1951, amending the agreement of December 14, 1944, is an existing contract within the meaning of the Enabling Act of 1949 and the Philadelphia Home Rule Charter.

Defendant also contends that the amendatory agreement provides for the performance of governmental rather than proprietary functions of the city and for that reason it is not binding upon the present city government.   It maintains that the members of plaintiff unions are engaged in governmental functions.   They are engaged in street cleaning, repairing and resurfacing streets, maintaining the mechanical equipment for the various city departments and operating the water bureau, etc.   Incidentally, the garbage collected by the street cleaning department is processed at garbage reduction plants and the residue is sold to individuals and corporations for fertilizer and the manufacture

of grease; the highway department collects fees from plumbers for excavating streets and the costs of re-paving streets and repairs to sidewalks and curbing are collected from abutting property owners; the water department sells water for which it is paid by so-called water rents, etc. See F. J. Kress Box Company et al., v. Pittsburgh et al., 333 Pa. 121, 122 (1939), wherein it was held that the erection and operation of an incinerator plant by the city was in its proprietary capacity. As we shall show hereinafter it is not necessary for us to determine what portion of the services of plaintiffs' members are governmental or proprietary in nature. The question for our consideration is whether or not the outgoing mayor and city council had the power to bind their successors to a contract which was to commence in the old term but run for the major portion of its duration under a new administration.

In Commonwealth ex rel. Fortney, for use, v. Bartol et al., 342 Pa. 172, 174 (1941), Mr. Justice (now Chief Justice) Stern stated,

"The service of a fire department is governmental in character: Devers v. Scranton City, 308 Pa. 13, 161 A. 540. In the performance of sovereign or governmental, as distinguished from business or proprietary, functions, no legislative body, or municipal board having legislative authority, can take action which will bind its successors (citing cases). It cannot enter into a contract which will extend beyond the term for which the members of the body were elected."

See and compare Graham v. Philadelphia, 334 Pa. 513 (1939), where a contract to assign certain rental from a gas works lease was upheld as binding on municipal successors, the contract being deemed to relate to proprietary matters and being reasonable in its terms.

This rule laid down in the Fortney case is in accord

with the general rules enunciated in 37 Am. Jur. 679-80, §66, Municipal Corporations, on the subject of municipal acts binding successors. In this section the pertinent portion is as follows (p. 680) :

"As a general rule, the appointment and removal of public officers is a governmental function, and a municipal council cannot engage a public officer by contract for a term extending beyond that of its own members, so as to impair the right of their successors to remove such officer and to appoint another in his place. In a few jurisdictions, however it is held that contracts of employment and appointment of officers may extend beyond the term of the council. *The foregoing majority rule ordinarily has no application to persons holding a mere employment*, such as schoolteachers, and with them a contract may be made extending beyond the term of the members of the council who make it, although there is authority for the contrary view. Moreover, it has been held in such cases that where the period for which the contract is made lies wholly within the term of the succeeding council, the contract is invalid." (Italics supplied.)

It is important to determine whether the *subject matter* of the contract we are considering is governmental or proprietary in nature. The parties have belabored the question of whether the various bureaus of city government in this case are performing governmental or proprietary functions. We have indicated that the employes perform both types of functions. However, it is crucial to observe that the nature of the functions performed by these employes does not in any way govern the case. This is a contract not a tort case.[2] The subject matter of the contract we are

---

2. The subject of municipal liability for torts occurring in the performance of governmental function and liability for torts in the performance of proprietary functions, including a discussion of what constitutes a governmental function, is considered in Scibilia

considering is not the functions of these particular bureaus, but the employment of their personnel and the terms of their employment. The question is whether a collective bargaining contract entered into between labor unions and a municipality relating to hours of employment and compensation of manual and other workers relates to a governmental function so as not to be binding on a successive administration. So far as our research shows this is a question of first impression.

We are of the opinion that a collective bargaining agreement in regard to its municipal employes cannot be regarded as so related to a governmental function that it is not binding on a subsequent municipal legislative or administrative body. Contracts of employment as to the city's manual laborers cannot be placed in the same category as contracts with public officers or other personnel whose particular functions impel a conclusion that their employment affects the very exercise of governmental powers such as legal counsel or an engineer. With the advent of the collective bargaining contract there must be regarded a real distinction from those cases which involve single officials or persons. Such collective bargaining contracts must be regarded as proprietary in nature, as between a corporation and its employes, and the municipality must be responsible for the performance of its provisions. Of course, there is a limit to the extent to which such contract, or any other type of contract, may bind successive administrations. All proprietary contracts are subject to the rule of reason; they must be entered into

---

v. Philadelphia, 279 Pa. 549 (1924). See generally Hartness v. Allegheny County, 349 Pa. 248 (1944); Szilagyi v. Bethlehem, 312 Pa. 260 (1933); Honaman v. Philadelphia, 322 Pa. 535 (1936); Annotation, "Cleaning and sprinkling of streets as governmental or private function as regards municipal immunity from liability for tort," 156 A. L. R. 692. See also Healy v. Philadelphia, 321 Pa. 488 (1936).

in good faith, be reasonably beneficial to the city in their terms and the reason for extending their performance into a successive administration must be prompted by the necessities of the situation. Thus, where a collective bargaining agreement by its terms is to expire shortly prior to a change of administration there must be some responsible municipal governing body with the power to speak for the community in a binding fashion: McBean v. Fresno et al., 112 Cal. 159, 44 Pac. 358, 31 L. R. A. 794; Denio et al. v. Huntington Beach, 22 Cal. 2d 580, 140 P. 2d 392, 149 A. L. R. 320, and see Pima County v. Grossetta et al., 54 Ariz. 530, 97 P. 2d 538 (1939).

In Kosek v. Wilkes-Barre Township School District, 110 Pa. Superior Ct. 295 (1933), it was held that a medical inspector was not an "appointed public officer" subject to removal at the pleasure of the appointing power; that he was entitled to recover his salary for improper removal. The court adopted and approved the following language of Judge Gawthrop in Foyle et al. v. Commonwealth et al., 101 Pa. Superior Ct. 412, 416 (1930):

"There is a well recognized and definite distinction between an office and an employment, although it is not always easy to determine whether a person is an employee or an officer. The general rule is that a position is a public office when it is created by law, with duties cast on the incumbent which involve an exercise of some portion of the sovereign power and in the performance of which the public is concerned, and which also are continuing in their nature and not occasional or intermittent; while a public employment, on the other hand, is a position which lacks one or more of these elements: 22 R. C. L. , sec. 12, p. 381."

See also In re Op. of Judges, 3 Me. 481; 20 C. J. 1244, note 72(b). Judge James, speaking for the court in the Kosek case (at p. 302), also stated in regard to the Scibilia case, supra:

"Although it was held in that case that the City of Philadelphia, in the performance of its public duty of collecting refuse and ashes, was performing a purely public function and was not liable for injuries sustained through its employes, it did not decide that those employes in carrying on a public function of collecting refuse and ashes were public officers within the meaning of the constitution."

As indicated by Judge James the nature of the function performed does not control the conclusion of whether or not a contract of employment with the person performing the function is governmental in nature. Plaintiff employes cannot be regarded as incumbents of a public office or with duties involving the exercise of some portion of sovereign power. See Annotation, "Power of a board to appoint officer or make contract extending beyond its own term", 70 A. L. R. 794, as supplemented in 149 A. L. R. 336.

Defendant city contended in its brief and oral argument that the action of the retiring city council was not necessary; that the situation did not require "haste" within the principle enunciated in the McCormick v. Hanover Township case, and that the action of the outgoing mayor and city council within a short period of time before the new city administration took over was really for the purpose of binding the hands of the incoming administration.

It must be carefully borne in mind that the agreement of December 4, 1951, is no more than an amendment to the contract of December 14, 1944; that the 1944 agreement by its terms was designed to continue from year to year. *In any event the 1944 agreement would have continued into the present city administration.* The only change effected by the amendment was to grant to the employes of plaintiff unions a 40-hour week for which they had fought earnestly over a long period of time. It was incumbent upon the 1951 city

council to determine whether any of the terms of the agreement of 1944 should be amended.

It is contended that city council, with knowledge of its power having been taken away, deliberately resorted to undue haste for the purpose of binding the hands of the new city council. Of course this is not correct. The council's power had not been taken away, on the contrary, it had the duty and power to consider renewal of the 1944 agreement. How could the old city council possibly have waited until January 7th, as suggested by the city. By January 7, 1952, the old agreement of 1944 would have become binding *as unchanged* until December 31, 1952, and plaintiff employes could not then have realized any improvement in their hours or wages. At the *proper time* for consideration of renewal and amendment of the 1944 contract the machinery of government under the new charter was not in existence. A "lame duck" council has the duty of government and we cannot accept defendant's contention that governing power was somehow suspended in Philadelphia until January 7, 1952.

In the light of what we have said above we call attention to section A-108 of the Home Rule Charter which makes the obligations of "all existing contracts" binding on the city officers, departments, etc., under the new city government performing the same functions and duties of the various departments of city government under the old city charter of 1919; and section 11 of the Enabling Act (First Class City Home Rule Act) which keeps in full force and effect existing contracts. We are of the opinion that the contract we are considering is valid and enforcible and the appropriation made is available for its performance. The statement in Fortney v. Bartol, supra, that budgetary appropriations did not create in plaintiff there a vested right in any fund must be read in relation to the facts in that case. It was there held that the

commissioners of a township in the coal region of this State could not by agreement or ordinance or resolution make it obligatory upon a future body to enact an ordinance to appropriate to plaintiff, a volunteer fire department of the township, specified sums of money. It was shown in that case that "due to the catastrophic situation in the coal mining industry the amount of taxes was hopelessly inadequate to pay the debt service and the general operating expenses of the township, and the funds [for meeting the agreement with the volunteer fire department] had been pledged to a bank for money borrowed," etc. (part in brackets supplied). But in the case before us we do not have any such facts. There is no allegation that the city taxes for the year 1952 were inadequate to meet the debt services and general expenses of the city or that the fund appropriated has been pledged or disposed of in any way or is not available for carrying out the obligation assumed. We have here a valid contract and an appropriation which the council and the mayor were authorized to make under the 1919 charter (Act of June 25, 1919, P. L. 581, art. XVII), the obligation of which cannot in good conscience be abrogated or abridged, at least to the extent that money has been appropriated for the purpose. To decide otherwise would be under the circumstances here to make a farce out of the negotiations with the labor unions for the purpose of entering into collective bargaining contracts.

Finally defendant contends that the mandatory agreement results in an unreasonable discrimination in that the employes of the city departments who are members of plaintiff unions with whom the city has entered into a collective bargaining contract are given a higher rate of pay than the employes of departments that are nonunion members and their hours of employment are different. We see no merit in this contention.

No statute or provision of the Charter of 1919 or the new Home Rule Charter has been called to our attention providing that the city cannot vary the rate of pay of its different employes or forbidding it to enter into a collective bargaining agreement or providing that *every* employe shall have the same rate of pay and arrangement of hours of employment; nor do we find that factually there has been any unreasonable discrimination among the employes of the city in this matter.

The city recognized plaintiffs as agents of certain groups of municipal employes who were members of plaintiff unions in 1944 and, as previously stated, on December 14th of that year entered into a contract with plaintiffs, as referred to above, which provided in part:

"1. The regular work week for the employes shall consist of a regular work week of forty-eight (48) hours. The forty-eight (48) hour work week shall consist of six (6) days of eight (8) hours a day, Monday to Saturday, inclusive."

After the execution of this contract nonunion employes in the departments represented by plaintiff unions had the same standard work week of 48 hours, consisting of six days of eight hours a day, Monday to Saturday, inclusive, and the same rates of pay.

On January 2, 1952, city council passed and the mayor approved an ordinance which amended section 1 of the Ordinance of October 29, 1951, in the following terms:

"Section 1. The Council of the City of Philadelphia ordains that Section 1 of the Ordinance approved October 29, 1951, entitled 'An Ordinance establishing a standard work week for employees of the City of Philadelphia' is amended to read as follows:

'That on and after January 1, 1952, the standard work week of the employees of the City of Philadelphia and of the departments, bureaus, boards, commis-

sions and other agencies thereof shall consist of forty hours of work'."

This ordinance merely clarified city council's intention to provide for a five day, forty hour work week for *all* city employes, both union and nonunion.

The ordinance passed by city council and approved by the Mayor of the City of Philadelphia on December 14, 1951, for the adoption of a financial program for the City of Philadelphia for the year 1952, and making appropriations to carry such program into effect, provided, inter alia, under the heading, "Department of Public Works", as follows:

"That employees who are now receiving compensation for forty-eight hours per week shall not receive less weekly compensation under the forty-hour work week."

The above statement makes no distinction whatsoever between union and nonunion employes but applies to all employes in the department of public works who were then receiving compensation for 48 hours per week.

In order to carry out the above-quoted provision that employes who were then receiving compensation for 48 hours per week should not receive less weekly compensation for a 40-hour work week, city council inserted in the Budget Ordinance of December 14, 1951, table IV, covering per diem workers whose work week was being reduced from 48 hours to 40 hours. This table increases the rates by 20 percent so that for a five-day eight-hour week the per diem employes would receive the same pay as for a six-day eight-hour week.

Immediately after table IV in paragraph 6 of section 2 of the Budget Ordinance of December 14, 1951, is the following statement:

"Any payment made in accordance with Table IV shall apply to all employees covered by Section 3 of the agreement entered into under provisions of ordinance of October 29, 1951."

This language, rather than giving union employes in the department of public works preferential treatment with respect to rates of pay, merely assures non-union employes the same treatment accorded union employes. There are many hundreds of city employes who render varied and different types of services and we are of the opinion that the ordinances and agreement made by the council and mayor as aforesaid were not illegal, discriminatory or unreasonable.

Plaintiffs' rule for judgment on the pleadings is made absolute and for the reasons given above we enter the following

### Declaratory Judgment

And now, to wit, December 2, 1952, upon consideration of the petition for declaratory judgment and answer and petition for rule to show cause why judgment should not be entered on the pleadings in favor of plaintiffs, it is ordered, adjudged and declared that the agreement of December 14, 1944, entered into pursuant to Ordinance of Council dated December 7, 1944, by and between the City of Philadelphia and plaintiffs, and the amendment to the agreement of December 4, 1951, entered into pursuant to Ordinance of Council dated October 29, 1951, providing, inter alia, for a regular work week of 40 hours, consisting of five days of eight hours each, Monday to Friday, inclusive, and providing the compensation to be paid to the members of plaintiff unions, are valid and binding upon the parties thereto and in full force and effect as of January 1, 1952, and that the agreement and its amendments shall continue in full force and effect thereafter for the term as set forth therein; it is further ordered and declared that all employes whom plaintiffs represent are entitled to be paid in accordance with the terms of the amendatory agreement of December 4, 1951, and the Budget Ordinance of December 14, 1951,

provided, however, that such payments are limited to an amount not in excess of the sums appropriated by city council for carrying into effect the amendatory agreement of December 4, 1951.